**HERM HUGHES & SONS, INC., a Utah corporation, Plaintiff and Appellant,**

v.

**QUINTEK, a Utah corporation, Defendant and Appellee.**

No. 900529–CA.

Court of Appeals of Utah.

June 5, 1992.

Clark B. Fetzer and Patrick S. Hendrickson, Salt Lake City, for plaintiff and appellant.

D. David Lambert and Danielle M. Ferron, Provo, for defendant and appellee.

Before BILLINGS, JACKSON and RUSSON, JJ.

### AMENDED OPINION [1]

RUSSON, Judge:

Herm Hughes & Sons, Inc. (Hughes) appeals the trial court's ruling that no contract existed between Hughes and Quintek. We affirm.

### I. FACTS

Hughes is a general contractor doing business in the state of Utah. In October

---

**1.** This opinion replaces the opinion of the same name issued May 13, 1992.

1983, Hughes, in preparing a bid for construction of an elementary school in Roy, Utah, solicited bids from area subcontractors. Quintek, a subcontractor, prepared a bid to provide roof trusses for the project, which bid proposal was communicated by telephone to Hughes on October 25, 1983. The bid proposal was also reduced to writing and mailed to Hughes that same day. Quintek's written bid proposal specified that the offer was to be accepted within ten days and provided a signature line at the bottom of the document for Hughes to indicate its acceptance within that period.

Hughes received Quintek's bid proposal on October 27, 1983, but did not respond to Quintek's proposed offer within the ten-day limit. In mid-November 1983, after the ten-day period had run, Boyd Jacobsen, President of Quintek, contacted Hughes by telephone to inquire about a contract. A few days later, Jacobsen went to Hughes's offices and again inquired about a contract and requested a set of plans. At that time, Hughes delivered a supplier's agreement to Jacobsen and told him that if he was "going to do the job, [he would have] to sign [that] agreement."

Quintek refused to sign the supplier's agreement because of material changes from its bid proposal. Specifically, Quintek contends that Hughes's supplier's agreement contradicted Quintek's offer by accounting for an eight-percent discount without requiring payment within ten days of invoice per Quintek's offer. The agreement also differed from the bid proposal by permitting Hughes to retain ten percent of the purchase price until completion of the project. Finally, the supplier's agreement added the following provisions, to which Quintek objected: (1) a provision obligating Quintek to Hughes for the obligations Hughes had to the owner, (2) a liquidated damages provision, and (3) an indemnification provision.

During the period from December 1983 to February 1984, Hughes and Quintek continued negotiations concerning the prospect of Quintek's supplying the trusses for the project. In December 1983, Quintek submitted a single shop drawing to Hughes with the explanation that in the event a contract could be negotiated, the drawings would need to be processed in order for Quintek to begin work on schedule. However, no trusses were ever manufactured.

In February 1984, Quintek, still pursuing a contract with Hughes, prepared and submitted a new bid proposal to Hughes to provide the trusses. This bid proposal was higher than the initial bid submitted in October 1983 due to increased material costs. Hughes rejected Quintek's proposal and ultimately accepted a bid for the trusses from another contractor.

In June 1984, Hughes commenced an action against Quintek for breach of contract, seeking damages in the amount of $8,695.44, the difference between Quintek's initial bid and the price that Hughes ultimately paid for the trusses. At trial, the circuit court ruled that Hughes had failed to establish the existence of a contract between the parties. Hughes appeals that decision.

## II. ANALYSIS

The sole issue on appeal is whether the trial court erred in ruling that no contract existed between Hughes and Quintek for the supply of roof trusses. Whether a contract exists between parties is a question of law; therefore, we review the trial court's conclusion of law under a correction of error standard. *Bailey v. Call*, 767 P.2d 138, 139 (Utah App.), *cert. denied*, 773 P.2d 45 (Utah 1989); *accord Scharf v. BMG Corp.*, 700 P.2d 1068, 1070 (Utah 1985).

Hughes asserts that a contract was formed when it delivered the supplier's agreement to Jacobsen in response to Quintek's bid proposal. Hughes contends that although it failed to respond to Quintek's original bid proposal within the specified ten-day limit, that offer was renewed when Jacobsen telephoned and later personally contacted Hughes requesting a contract to supply the trusses for the project. Hughes argues that when it delivered the supplier's agreement to Jacobsen, that agreement, despite its additional terms, constituted an acceptance of Quintek's offer, pursuant to

Utah Code Ann. § 70A–2–207(1) (1990), which provides:

A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.

Alternatively, Hughes argues that a contract was formed by the parties' conduct.

Quintek responds that no contract ever existed between Hughes and Quintek, and that section 70A–2–207 only applies when a contract already exists and the sole dispute concerns the contract's terms. Thus, Quintek argues, that section does not apply in the present case. Additionally, Quintek contends that a contract was not formed by the parties' conduct. We agree.

Prior to addressing Hughes's claim that its supplier's agreement was a valid acceptance under section 70A–2–207(1), which relates to different or additional terms contained in an acceptance, it must first be determined whether an underlying agreement between Hughes and Quintek existed, pursuant to Utah Code Ann. § 70A–2–204(1) (1990), which states: "A contract for sale of goods may be made in any manner *sufficient to show agreement,* including conduct by both parties which recognizes the existence of such a contract." *Id.* (emphasis added).

■ In construing the Uniform Commercial Code, courts in other jurisdictions, as well as legal commentators, have consistently recognized the necessity of finding an underlying agreement pursuant to U.C.C. § 2–204 as a prerequisite to the application of U.C.C. § 2–207. In *U.S. Indus., Inc. v. Semco Mfg., Inc.,* 562 F.2d 1061 (8th Cir. 1977), the court stated:

"Only where all the traditional criteria of intent are met showing that a contract has been made should Section 2–207 be applied; only then should the prescriptions of Section 2–207 as to additional terms become relevant." R. Duesenberg & L. King, Bender's Uniform Commer-

cial Code Service § 3.05, at 3–51 (1977). *See Duval & Co. v. Malcom,* 233 Ga. 784, 214 S.E.2d 356 (Ga.1975). The court here must interpret the terms of the offer and the acceptance, which are stated differently, to determine if the return document diverges *significantly* as to a dickered term. . . .

*Id.* at 1067 (emphasis in original) (footnote omitted).

Further, in *Koehring Co. v. Glowacki,* 77 Wis.2d 497, 253 N.W.2d 64 (1977), the Wisconsin Supreme Court stated that "before we reach the question of additional or different terms added to a contract, we must first inquire whether or not any contract ever existed." *Id.* at 67; *accord Marlene Indus. Corp. v. Carnac Textiles, Inc.,* 45 N.Y.2d 327, 408 N.Y.S.2d 410, 380 N.E.2d 239, 240–41 (1978).

Finally, *Anderson on the Uniform Commercial Code* states:

UCC § 2–207 is based on the assumption that it is admitted that there is a contract and the controversy is only as to its terms.

There must be a contract in order for UCC § 2–207 to apply. "[UCC § 2–207] does not apply if the general contract formation rules of [UCC § 2–204] are not met. [UCC § 2–207] does not change the traditional rule that, in order to create an enforceable contract, the parties must mutually assent to all essential terms of the supposed agreement."

UCC § 2–207 does not apply unless there is first a pre-existing contract between the parties. The provision is not applicable when there never was a contract because a qualified acceptance had been made.

2 Ronald A. Anderson, *Anderson on the Uniform Commercial Code* § 2–207:7 at 274 (3d ed. 1982) (footnotes omitted).

Therefore, as a threshold issue, we must determine whether there was a "meeting of the minds" sufficient to establish the existence of an agreement between Hughes and Quintek under section 70A–2–204(1). *See Koehring,* 253 N.W.2d at 67–68.

We turn first to Quintek's offer. Quintek contends that its offer to supply the trusses expired by its own terms prior to any acceptance by Hughes. Hughes responds that although it failed to respond to Quintek's original bid proposal within the specified ten-day limit, that offer was renewed when Jacobsen telephoned and later personally contacted Hughes requesting a contract to supply the trusses for the project.

Utah Code Ann. § 70A–2–206 (1990) provides in pertinent part:

(1) Unless otherwise unambiguously indicated by the language or circumstances

(a) an offer to make a contract shall be construed as inviting acceptance in any manner and by any medium reasonable in the circumstances....

While Quintek's initial written offer had expired prior to Hughes's acceptance, Quintek renewed that offer by its subsequent solicitation of a contract from Hughes, both by telephone and in person. Therefore, Quintek's offer to contract invited Hughes's acceptance under section 70A–2–206.

Having determined that Quintek renewed its offer to supply the trusses, we must next determine whether delivery of the supplier's agreement constituted a valid acceptance of Quintek's offer forming a contract between the parties. *See Semco*, 562 F.2d at 1067. We conclude that it did not. Hughes's supplier's agreement not only added additional terms, but directly contradicted Quintek's offer, specifically in its treatment of payment terms. Quintek's bid proposal provides that Quintek would supply the trusses for $42,518 less eight-percent discount if paid within ten days of invoice, eleven days net including tax and FOB jobsite on the truck. Section 3 of Hughes's supplier's agreement states:

It is agreed that the Contractor shall pay to the Supplier for the satisfactory completion of all materials furnished the sum of *Forty Two Thousand Five Hundred Eighteen Dollars And No Cents ($42,518.00)* including all state and local sales and use taxes in monthly payments of 90% of the materials furnished in any preceding month....

Quintek's offer and Hughes's acceptance indicate significant divergence with respect to payment terms. Quintek's offer expressly limits the eight-percent discount to full payment made within ten days of invoice; however, Hughes's supplier's agreement explicitly accounts for the eight-percent discount, yet only requires that Hughes pay ninety percent of the cost of materials furnished in the preceding month. Moreover, the offer's requirement that Hughes make full payment within the time limit in order to receive the discount proscribes Hughes's ten-percent retention which would result in a gratis extension of credit to Hughes until completion of the project. Given the materiality of the payment terms to this contract, Quintek's bid proposal and Hughes's supplier's agreement fail to evidence a "meeting of the minds" sufficient to establish a contract.

Quintek's immediate rejection of Hughes's supplier's agreement also indicates that the parties did not reach a "meeting of the minds." The undisputed testimony of Quintek's president, Jacobsen, indicates that upon reviewing the supplier's agreement, he immediately contacted Hughes and rejected the agreement, citing the divergence in payment terms, as well as additional terms contained therein. Moreover, when Jacobsen challenged the supplier's agreement, the project manager for Hughes, Mr. Walker, instructed him that "this is our subcontract agreement. If you're going to do the job, you've got to sign our agreement." Jacobsen's refusal to accept or sign the agreement clearly indicates that the parties failed to reach an agreement as to the essential terms of the subcontract. Thus, Quintek's offer and Hughes's supplier's agreement do not establish a "meeting of the minds" as to form a contract between the parties.

Hughes next argues that even if an agreement was not reached by Hughes's delivery of the supplier's agreement, a contract was nevertheless established by the conduct of the parties pursuant to Utah Code Ann. § 70A–2–204(1) (1990), which

provides: "A contract for sale of goods may be made in any manner sufficient to show agreement, *including conduct by both parties which recognizes the existence of such a contract."* *Id.* (emphasis added).

■ Specifically, Hughes contends that the following conduct established a contract between Hughes and Quintek: (1) Jacobsen went to Hughes and requested a contract, (2) Hughes prepared a supplier's agreement based on the terms of Quintek's bid, (3) Hughes delivered the supplier's agreement to Quintek, (4) Hughes gave Quintek a single set of plans, (5) Quintek maintained a progress log for the project, (6) Quintek delivered a single shop drawing to Hughes, and (7) Hughes and Quintek maintained communication regarding the design of the trusses.

The above conduct is no more indicative of the parties' mutual recognition of a contract than it is of the parties' concerted efforts to reach an agreement for the supply of trusses for the project. Furthermore, Hughes ignores critical facts that demonstrate that Quintek never acknowledged the existence of a contract. Specifically, Hughes overlooks the fact that Quintek rejected Hughes's supplier's agreement; that Quintek did not begin fabricating the trusses; and that Quintek, in February 1984, attempted to make a new offer to supply the trusses for the project. Because the conduct of Quintek and Hughes does not demonstrate the recognition of a contract as required by section 70A-2-204(1), we conclude that a contract was not formed under that section.

Therefore, because Hughes has failed to establish an underlying agreement pursuant to section 70A-2-204(1), we cannot reach Hughes's section 70A-2-207 argument relating to different and additional terms.[2]

## III.   CONCLUSION

The trial court properly determined that no contract existed between Hughes and Quintek since there was never a meeting of the minds between the parties as to the material terms of the contract. Accordingly, we affirm the trial court's ruling that no contract existed between Hughes and Quintek.

BILLINGS and JACKSON, JJ., concur.

---

**2.** Even were we to reach Hughes's section 70A-2-207 claim, Hughes's delivery of the supplier's agreement would not operate as a valid acceptance under that section. That section invalidates an acceptance if it "is expressly made conditional on assent to the additional terms." The evidence at trial was that when Hughes delivered the supplier's agreement to Jacobsen, Hughes told him that if he was going to do the job, he would have to sign that agreement. Since Hughes's acceptance was conditioned on assent to the additional or different terms contained in the supplier's agreement, the agreement did not constitute a valid acceptance to Quintek's offer under that section.