RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 04a0423p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

GAGE PRODUCTS CO.,

_Plaintiff-Appellant,_

_v._

No. 03-2362

HENKEL CORPORATION,

_Defendant-Appellee._

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 02-72231—Paul D. Borman, District Judge.

Argued: September 15, 2004

Decided and Filed: December 9, 2004

Before: BOGGS, Chief Judge; CLAY, Circuit Judge; HAYNES, District Judge.[*]

_____

## COUNSEL

**ARGUED:** Jeffrey C. Gerish, PLUNKETT & COONEY, Bloomfield Hills, Michigan, for Appellant. Robert M. Horwitz, DYKEMA GOSSETT, Detroit, Michigan, for Appellee. **ON BRIEF:** Jeffrey C. Gerish, PLUNKETT & COONEY, Bloomfield Hills, Michigan, for Appellant. Robert M. Horwitz, Kyle R. Dufrane, DYKEMA GOSSETT, Detroit, Michigan, for Appellee.

_____

## OPINION

_____

CLAY, Circuit Judge. Plaintiff Gage Products Company, a chemical supplier to DaimlerChrysler Corporation's Jefferson North Assembly Plant, appeals the September 8, 2003 order of the district court granting summary judgment in favor of Defendant Henkel Corporation and the September 23, 2003 order denying Gage's motion for reconsideration. On May 29, 2001, Henkel became the sole Tier I supplier of chemical products to the plant pursuant to Chrysler's Total Chemical Management Program ("TCM Program"). As a consequence, Gage, which previously had been one of several Tier I suppliers to the plant, became a Tier II supplier and began selling its chemical products directly to Henkel instead of Chrysler. Henkel insisted on paying Gage the prices Gage had been charging Chrysler for chemical products prior to May 29, 2001 ("the current prices"). Gage insisted that it would sell its products to Henkel only if Henkel paid the prices Gage had proposed to Chrysler in November 2000, but that Chrysler had not yet approved

_____

[*] The Honorable William J. Haynes, Jr., United States District Judge for the Middle District of Tennessee, sitting by designation.

("the higher prices"). Despite the parties' apparent disagreement over price, Henkel ordered, and Gage shipped, chemical products in response to those orders. The district court held that Gage did not create a genuine issue of material fact as to whether Henkel breached a contract to pay Gage the higher prices for its chemical products, which Chrysler eventually approved in August 2001. The district court also held that there was no genuine issue of material fact as to whether Henkel's promise to honor Gage's higher prices upon Chrysler's approval amounted to fraud. For the reasons that follow, we **AFFIRM, in part,** and **REVERSE, in part,** the judgment of the district court.

**I.**

### A.     Substantive Facts

In early 2001, pursuant to its newly-instituted TCM Program, DaimlerChrysler ("Chrysler") issued a Request for Quotation ("RFQ") for the position of Chemical Manager at its Jefferson North Assembly Plant ("the Plant" or "JNAP") in Detroit, Michigan. Under this new TCM Program, Chrysler would contract directly with the Chemical Manager as opposed to contracting directly with numerous ("Tier I") chemical suppliers. The TCM Program would make the Chemical Manager the sole Tier I supplier and put the burden on the Chemical Manager to minimize waste and reduce costs through its direct dealings with the chemical suppliers. The RFQ required bidders to identify all of its proposed suppliers on whom the quotation price would be based and to divide the total cost of all of the chemicals supplied to the Plant by the total number of vehicles ("units") produced at the Plant, yielding a cost per unit, or "CPU," figure. Each bidder would then submit its respective cost per unit figure, which Chrysler would use to determine the low bidder. Each bidder would be required to propose cost per unit pricing for each of the three years of the contract, with the cost per unit price declining from year to year.

Both Gage Products Company ("Gage") and Henkel Corporation ("Henkel"), direct competitors and chemical suppliers to the Plant, bid for the Chemical Manager contract. To prepare its bid, Henkel solicited prices from Gage for various chemical products to be used for paint spraybooth maintenance, purge solvent, equipment cleaning, windshield solvent, floor cleaning, paint spraybooth coatings, and other specialty chemical products. On March 13, 2001, Gage submitted a quotation of $11.55 per unit, and attached a list of its products reflecting the price per gallon of each product.[1]

Gage claims that its March 13, 2001 quote was based on the prices that Gage had quoted and that Chrysler had been reviewing since November 2000.[2] Four months earlier, on November 9, 2000, Gage had informed Chrysler by letter that it would be raising its prices effective November 15, 2000 due to market conditions. As of March 13, 2001, Chrysler had yet to respond to Gage's plan to raise its prices.[3] In the meantime, Gage continued to invoice Chrysler at its current prices. Unbeknownst to Gage, Henkel disregarded the higher prices quoted on March 13, 2001, and instead submitted its Chemical Manager bid to Chrysler with what it believed to be Gage's current prices that it had obtained from Chrysler's computer system.

---

[1] The March 13, 2001 letter explained that "[t]his pricing includes packaging, freight, manpower …, and certain other manufacturing and administrative costs."

[2] The March 2001 prices quoted to Henkel actually were higher than the increased prices Gage sought from Chrysler in November 2000. *Compare* J.A. 220 to J.A. 342. One witness for Gage attributed the higher prices to increased manpower costs, although his testimony arguably conflicts with the testimony of another Gage witness. *Compare* J.A. 371-72 to J.A. 185-86.

[3] Chrysler did not provide its approval for the increase until August 2001, almost five months after the commencement of the TCM Program.

On April 1, 2001, Chrysler named Henkel the Chemical Manager.  On April 26, 2001, Henkel complained about Gage's prices and requested Gage to provide its current pricing for Chrysler.[4]  Gage refused to quote Henkel its current prices, instead offering to supply its products at the prices based on the November 9, 2000 letter to Chrysler.  Gage believed that these higher prices, which were to have taken effect the preceding November 15, 2000, represented its current pricing for Chrysler, even though Chrysler had not yet approved the new prices.

On May 16, 2001, representatives from Gage and Henkel met and again discussed Gage's pricing.  At that meeting, Charles Schilling, Henkel's Sales Director, asked Jay Hohauser, Gage's Business Manager for Chrysler Accounts, to quote Gage's current Chrysler pricing.  Hohauser responded that Gage was expecting  Chrysler to authorize its higher prices.  Schilling responded that if Chrysler awarded Gage the increased pricing, Henkel "will pay that."

On May 18, 2001, Joe Farren, Henkel's Chemical Manager at the Plant, sent an e-mail to Hohauser stating, "Jay, perhaps I wasn't emphatic enough at our meeting the other day…. You were to have the current pricing used at [the Plant] to Chuck Schilling and myself yesterday.  If purchasing OK's a price increase we will certainly honor it.  Until then please provide the current pricing in effect for [the Plant.]"  A few days later, Hohauser told Farren by e-mail, "[Chrysler Purchasing has] confirmed a path forward for our price adjustments which will be in effect next Tuesday, May 29th.  Therefore, the original pricing we submitted in March, which reflects our price adjustments plus our manpower at [the Plant], is our pricing."  *Id.*[5]

On May 21, 2001, Schilling sent an e-mail to Chrysler, requesting verification of Hohauser's claim about an authorized price increase effective May 29, 2001.  Chrysler responded that Gage's increases had not been authorized and that any changes that may occur with Gage in the future would not affect the launch of the TCM Program on May 29, 2001.

When the TCM Program launched on May 29, 2001, Henkel needed to order chemical products from Gage to avoid shutting down the Plant.  Henkel argues that, as of the launch date, Gage still had "refused to divulge" the prices it was charging Chrysler at the time and that it "was forced to obtain [the prices] through its access to Chrysler's computers."  *Def.'s Br.* at 9,10 and 12. As noted, however, Henkel already knew Gage's Chrysler pricing because it had accessed that information in March 2001 in order to prepare its bid for the Chemical Manager contract.  Again, it appears that Henkel was not seeking pricing information from Gage, but a price quotation (a so-called blanket purchase order) from which Henkel could order Gage's products.  This view is supported by the fact that, beginning on May 29, 2001, Henkel issued individual purchase orders to Gage using the prices Henkel had accessed from Chrysler's computer system.

Henkel sent its first purchase order to Gage on May 29, 2001.  This purchase order, as well as all subsequent orders, stated at the top:

> Confirm receipt of PO by fax, verifying price and advising firm ship date.
> HENKEL WILL ONLY PAY CHARGES LISTED ON THIS PO.

Upon receipt, Yelena Paykina, who processed Gage's orders, spoke with Vicki Erdem at Henkel, who confirmed that the parties did not have a signed blanket purchase order contract.  When Paykina stated that

---

[4] As noted, Henkel already knew Gage's Chrysler pricing by virtue of its access to Chrysler's pricing database in preparation of its bid for the Chemical Manager position.  Thus, it appears that when Henkel asked for Gage's current pricing, it was not seeking pricing information, but wanted Gage to submit a price quotation so that Henkel could order Gage's products at the same prices Gage was charging Chrysler at the time.

[5] *See* note 2, *supra*, regarding the fact that the prices Gage quoted to Henkel in March 2001 were higher than the price increases Gage had requested from Chrysler in November 2000.

Gage could not ship any products to Henkel without a contract, Erdem said that Gage "can't do that" and that Gage needed to continue shipping until the issue was settled to avoid shutting down the Plant. Daniel Logan, Gage's Director of North American Automotive Operations, was concerned about keeping the Plant running and maintaining Gage's cash flow. Logan also was under the impression that Chrysler soon would approve Gage's requested price increases and that Henkel would honor those increases. He therefore instructed Ms. Paykina "to put in the old pricing in order to get cash coming in, with the understanding that Henkel had told [Gage] that when [Gage] received the increases, [Henkel] would honor them."

Between May 31 and June 19, 2001, Gage shipped products to Henkel in response to Henkel's purchase orders and invoiced Henkel approximately 50 times according to Gage's then-current pricing with Chrysler. On 12 occasions, Henkel issued purchase orders to Gage listing prices for various products that were not, in fact, Gage's current Chrysler prices; some prices on Henkel's purchase orders were too high, and some were too low. On each of those occasions, Gage acknowledged Henkel's purchase order by faxing a copy of the original purchase order back to Henkel with the correct Chrysler pricing handwritten on the purchase order. Upon receipt of the price acknowledgments from Gage, Henkel sent Gage a cancellation of the original purchase order, followed by a new purchase order confirming the correct price. Gage then shipped the products to the Plant and issued invoices to Henkel that referenced the correct current price. Gage did not alter those Henkel purchase orders that listed the correct current prices.

In the meantime, on May 31, 2001, Henkel again sought a price quote from Gage on its products. On the same day, Gage representatives, including Logan and Jeffrey Patsy, met with Henkel representatives, including Schilling and Farren, to discuss the pricing issue. Gage insisted on its pricing schedule submitted in March 2001. Schilling, and possibly Farren as well, responded that Henkel wanted to pay Gage its current prices but that Henkel would honor the higher prices upon Chrysler's approval.

On June 1, 2001, Logan wrote a letter to Schilling attaching a price quote for Gage's products and stating, "Per your request the prices are lower than what was previously quoted to you on March 13, 2001. These prices reflect our price adjustments submitted to [Chrysler] on November 9, 2000, effective November 15, 2000."

On June 19, 2001, Thomas Randazzo, Gage's Vice President and General Counsel, wrote a letter to John Sloan, Henkel's purchasing agent, stating that the unit prices listed on all of Henkel's purchase orders since May 29, 2001were incorrect and that Gage expected to be paid for all products shipped at the unit prices Gage had quoted to Henkel on March 13, 2001. Randazzo advised that Gage would be issuing new invoices to Henkel to reflect the unit prices for all products shipped between May 29, 2001 and the date of his letter and would be issuing all future invoices for products shipped at the March 13, 2001 unit price. Gage followed through and, beginning on June 20, 2001, issued invoices for newly delivered products at the higher prices and issued revised invoices for previously shipped products, demanding payment for the difference between what Henkel already had paid and the higher prices.

On June 22, 2001, Sloan responded to Randazzo, stating:

> The prices listed on each Purchase Order represent the most current price DaimlerChrysler was paying prior to Henkel Chemical Management being awarded the Chemical Management Contract. These prices shall not be adjusted without DaimlerChrysler-JNAP approval.

Sloan further advised that Henkel "rejects any price for any product or material that is inconsistent with DaimlerChrysler's acquisition price prior to the implementation of the Chemical Management Program. Henkel has never agreed to any other price …." Sloan noted that Gage's insistence on the pricing set forth in its March 13, 2001 letter was "curious considering that Gage Products has been invoicing Henkel at different pricing – namely the pricing that was in effect prior to Henkel assuming chemical management responsibilities." Gage appropriately interpreted Henkel's letter as a rejection of Gage's March 13, 2001

pricing, but Gage nevertheless decided to continue shipping products in response to Henkel's lower-priced purchase orders.

On August 26 and 29, 2001, Chrysler approved Gage's price increase retroactively to April 1, 2001, prior to the launch of the TCM Program. Gage then expected Henkel to pay the previously-issued invoices according to the now-approved prices submitted to Chrysler in November 2000. Henkel refused.[6] Nevertheless, on January 15, 2002, Schilling of Henkel purportedly met with three Chrysler representatives and stated the following: "[W]e understand you gave Gage a price increase and we'd like to discuss with you receiving a price increase and what we will do is we will pass all that money straight through to Gage for the increase." Schilling testified that Chrysler refused to give Henkel a price increase supposedly because the dispute between Henkel and Gage "had nothing to do with Jefferson North Assembly Plan[t] and the Total Chemical Management Program and Henkel."[7]

## B.     Procedural History

On March 28, 2002, Gage sued Henkel in the Oakland County Circuit Court, which Henkel timely removed to the United States District Court for the Eastern District of Michigan based on 28 U.S.C. § 1332 (diversity of citizenship). Gage's complaint alleged five claims: (1) breach of contract; (2) account stated; (3) promissory estoppel; (4) unjust enrichment and quantum meruit; and (5) fraud, misrepresentation, and fraud in the inducement. Gage did not request a trial by jury, meaning that the court would be the factfinder. After the close of discovery, Henkel moved for summary judgment. At oral argument on May 14, 2003, Gage consented to the dismissal of counts two, three, and four of the complaint.

On September 8, 2003, the district court granted Henkel summary judgment on Gage's remaining claims for breach of contract and for misrepresentation, fraud, and fraud in the inducement. The court dismissed Gage's breach of contract claim on the ground that Henkel's purchase orders indicating Gage's current prices were offers that Gage accepted (1) for transactions prior to June 20, 2001, by issuing invoices incorporating those prices and (2) for transactions after June 20, 2001, by shipping the products in response to Henkel's purchase orders. The district court dismissed Gage's claim for misrepresentation, fraud, and fraud in the inducement on the ground that Gage could not prove that it had relied on Henkel's promise to honor Chrysler's consent to Gage increasing its prices. The court cited the testimony of Gage's sales director who purportedly testified that Gage still would have supplied the Plant with chemical supplies even if Henkel had not promised to honor the anticipated price increases. The court dismissed the fraud claim on the alternative ground that a promise to do something in the future cannot give rise to a fraud claim. Although noting the existence of a "bad faith exception" to this general rule where a promise is made without the intention to perform, Gage allegedly failed to cite evidence showing that Henkel never intended to fulfill its promise to pay Gage its higher prices once approved by Chrysler.

Gage filed a motion for reconsideration, which the district court denied on September 23, 2003. Gage timely appealed the order granting Henkel's motion for summary judgment and the order denying Gage's motion for reconsideration.

---

[6] In its appellate brief, Henkel justifies its refusal on the ground that "Chrysler confirmed to Henkel that the increase did not concern the products delivered to the Plant during the Program because those products were the subject of purchase orders between Gage and Henkel." *Def.'s Br.* at 19 (citing J.A. 784 (October 29, 2001 letter from Sloan to Randazzo)). The Joint Appendix citation provided by Henkel, however, does not support this assertion and, in any event, constitutes hearsay evidence of what some unidentified individual at Chrysler allegedly told a representative of Henkel.

[7] Henkel's brief asserts that, at the meeting, "Chrysler told Henkel that it was not going to meddle in a dispute between Henkel and Gage and that it believed Gage had accepted Henkel's prices by shipping the products and invoicing Henkel at [Gage's original prices]." *Def.'s Br.* at 19 (citing J.A. 147). The Joint Appendix citation provided by Henkel, however, does not support this assertion and, in any event, constitutes hearsay evidence of what a Chrysler representative allegedly stated.

## II.

### A.　　Standard of Review

This Court reviews *de novo* a district court's decision to grant summary judgment. *Cockrel v. Shelby County Sch. Dist.*, 270 F.3d 1036, 1048 (6th Cir. 2001). Summary judgment must be granted if the pleadings and evidence "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). A dispute over a material fact is only a "genuine issue" if a reasonable jury could find for the nonmoving party on that issue. *Cockrel*, 270 F.3d at 1048 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In reviewing the district court's grant of summary judgment, this Court must view all the facts and the inferences drawn therefrom in the light most favorable to the nonmoving party. *Id.* (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

Generally, the denial of a motion to reconsider is reviewed for an abuse of discretion. *Northland Ins. Co. v. Stewart Title Guar. Co.*, 327 F.3d 448, 454 (6th Cir. 2003) (citing *GenCorp, Inc. v. Am. Int'l Underwriters*, 178 F.3d 804, 832 (6th Cir.1999)). However, when a Rule 59(e) motion seeks reconsideration of a grant of summary judgment, this Court conducts a *de novo* review using the same legal standard employed by the district court. *Id.* at 454-55 (citing *Smith v. Wal- Mart Stores, Inc.*, 167 F.3d 286, 289 (6th Cir. 1999); *Columbia Gas Transmission, Corp. v. Limited Corp.*, 951 F.2d 110, 112 (6th Cir. 1991)).

### B.　　Breach of Contract Claim

In its breach of contract claim, Gage alleges that, on May 16, 2001, Henkel agreed to pay prices for Gage products equal to the higher prices Gage had quoted to Chrysler on November 9, 2000 if Chrysler subsequently approved those prices. Gage further alleges that Henkel sent Gage purchase orders for chemical products on or after May 29, 2001, but at no time did Henkel advise Gage that it would not honor Gage's higher prices once approved by Chrysler. Gage argues that Henkel's purchase orders from June 1, 2001 onward constituted Henkel's acceptance of Gage's June 1, 2001offer (via the letter from Logan to Schilling) to sell the chemical products at the higher prices that Chrysler subsequently approved. According to Gage, Henkel's purchase orders manifested a "definite and seasonable expression of acceptance" of Gage's June 1, 2001 price quote (containing different prices) pursuant to Michigan's version of Uniform Commercial Code ("U.C.C.") § 2-207, MICH. COMP. LAWS §§ 440.2207. *See id.* § 440.2207(1) ("A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.").

The district court disagreed. Relying on *Herm Hughes & Sons v. Quintek*, 834 P.2d 582 (Utah Ct. App. 1992), the district court held that U.C.C. § 2-207 did not deem Henkel's purchase orders to be acceptances of the prices that Gage proposed on June 1, 2001, but instead deemed the orders to be counter-offers that Gage accepted when it shipped its products to Henkel and sent Henkel invoices at prices that matched the prices in Henkel's purchase orders. We agree.

In *Herm Hughes*, a contractor, Hughes, solicited bids from a subcontractor, Quintek, to provide roof trusses on a building project. *Id.* at 583. Quintek submitted a written bid that specified that the offer had to be accepted within ten days, but Hughes did not respond in a timely manner. *Id.* Thereafter, Quintek solicited Hughes for a contract, and Hughes delivered a supplier's agreement. *Id.* Quintek refused to sign Hughes's agreement because of material changes in the payment terms compared to Quintek's original bid proposal. *Id.* Hughes argued that, under U.C.C.§ 2-207(1), a contract was formed when it delivered its supplier's agreement to Quintek, despite its additional terms. *Id.* at 583-84. The court disagreed, holding

that § 2-207 did not apply without the existence of an underlying agreement pursuant to U.C.C. § 2-204.**[8]** *Herm Hughes*, 834 P.2d at 584. The court then found that Hughes's delivery of the supplier's agreement did not constitute a valid acceptance of Quintek's offer to provide roof trusses because the supplier's agreement "not only added additional terms, but directly contradicted Quintek's offer, specifically in its treatment of payment terms." *Id.* at 585. "Given the materiality of the payment terms to this contract, Quintek's bid proposal and Hughes's supplier's agreement fail to evidence a 'meeting of the minds' sufficient to establish a contract." *Id.*

So too in this case, the direct contradiction between the prices set forth in Gage's June 1, 2001 letter and Henkel's subsequent purchase orders demonstrated that the parties did not have a meeting of the minds sufficient to form a blanket contract covering all the transactions at issue. The price was the single factor preventing the parties from entering into a blanket purchase order agreement. Accordingly, we agree with the district court's conclusion that the parties did not have a contract by virtue of Henkel's purported acceptance of Gage's June 1, 2001 price list.

Even though the parties' initial writings did not establish a contract, the facts might support a finding that the parties thereafter formed a contract or a series of contracts. To address this issue, we, like the district court below, have broken the parties' transactions into two time periods: (1) orders and shipments that pre-date June 20, 2001 and (2) orders and shipments on or after June 20, 2001.

### 1.        Pre-June 20, 2001 Conduct

On March 13, 2001, Gage offered to sell its chemical products to Henkel for prices that were higher than it was charging Chrysler at the time. Over the next two months, Henkel insisted that Gage offer Henkel its current Chrysler pricing, but Gage refused to budge from its higher prices. By the time the TCM Program launched on May 29, 2001, Gage and Henkel still had not come to an agreement on price. On that date, Henkel effectively forced the issue by sending Gage a purchase order reflecting (it thought) was Gage's then-current Chrysler pricing. The purchase order prominently stated, "HENKEL WILL ONLY PAY CHARGES LISTED ON THIS PO." Upon receipt, Gage initially balked and told Henkel that it could not ship any products because it had not agreed as to price by signing a blanket purchase order contract. However, to avoid a plant shutdown, maintain cash flow, and preserve good relations with Chrysler, Gage opted to sell the goods to Henkel anyway. Henkel subsequently sent Gage numerous purchase orders at what it believed to be Gage's then-current Chrysler pricing. Gage received those purchase orders and, where applicable, corrected the prices to conform with its current Chrysler prices; some of those changes involved price reductions. Upon return of their corrected purchase orders, Henkel canceled them out and issued new purchase orders reflecting the corrected pricing provided by Gage. As before, the purchase orders prominently stated, "HENKEL WILL ONLY PAY CHARGES LISTED ON THIS PO." Upon receipt of the new purchase orders, Gage shipped the products to Henkel, followed by invoices mirroring the prices in the revised purchase orders.

Based on these facts, it is undisputed that Henkel expressly conditioned Gage's acceptance of its purchase orders on Gage's agreement to charge the prices listed in those orders. It also is undisputed that the parties' writings agreed on price prior to June 20, 2001. Although there is evidence that Henkel promised

---

**[8]**Michigan's version of U.C.C. § 2-204, MICH. COMP. LAWS § 440.2204,  provides:

(1) A contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract.

(2) An agreement sufficient to constitute a contract for sale may be found even though the moment of its making is undetermined.

(3) Even though one or more terms are left open a contract for sale does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy.

on various dates between May 16 and May 31, 2001 to pay Gage the higher prices if and when Chrysler so agreed, there is no evidence that Henkel agreed to pay those prices *before* Chrysler provided its approval (which did not occur until the following August) and/or that Henkel would honor those new prices retroactively upon Chrysler's approval. Rather, the evidence overwhelmingly suggests that Gage made a business decision to relinquish its right to enforce Henkel's promise to pay the higher prices when it affirmatively assented, in writing and without qualification, to Henkel's purchase orders at the lower prices. At no time prior to June 20, 2001, while it processed approximately 50 orders from Henkel, did Gage communicate the fact that it hoped or expected to be paid the prices subsequently approved by Chrysler; instead, it enclosed invoices confirming the prices set forth in Henkel's purchase orders. *Cf. Mantaline Corp. v. PPG Indus., Inc.*, No. 97-4473, 2000 WL 799337, at *3 (6th Cir. June 8, 2000) (holding that, because the seller shipped the goods "without any contemporaneous disclaimer" in response to buyer's purchase order, the purchase order ripened into a contract when the seller "accepted it by the prompt shipment of conforming goods"); *Mid-South Packers, Inc. v. Shoney's, Inc.*, 761 F.2d 1117, 1122 (5th Cir.1985) (holding that purchaser could not manifest acceptance to seller's new offer, thus inducing performance, and then revoke acceptance and demand compliance with terms of prior, withdrawn offer: "Shoney's secretly harbored intent to later deduct the difference between the old and new price could not bind Mid-South."). Therefore, we agree with the district court that there is no genuine issue of material fact as to whether Henkel breached its contract or contracts with Gage prior to June 20, 2001.

The decision in *Quaker State Mushroom Co. v. Dominick's Finer Foods, Inc.*, 635 F. Supp. 1281 (N.D. Ill. 1986), which Gage cites, does not imply a contrary result. *Quaker State* involved a buyer's four separate orders for mushrooms from the seller. The buyer placed two of the orders before November 10, 1983, the date when the seller notified the buyer of a price increase; however, all of the orders were shipped after November 10, 1983 and contained invoices at the higher prices. *Id.* at 1283. The court found that the seller's shipment of the mushrooms did not necessarily amount to an acceptance of the buyer's purchase orders at the lower price because the seller's November 10 notice "clearly rejected" the lower price listed in the buyer's purchase orders. *Id.*[9]

Assuming, as Gage argues, that Gage's March 13 and June 1, 2001 letters to Henkel were offers to sell products to Henkel at a particular price, it is clear that Henkel, like the buyer in *Quaker State*, placed orders at a fundamentally different price. In other words, Henkel rejected Gage's offers by making repeated counter-offers at a lower price. Moreover, *Quaker State* suggests that Gage accepted Gage's counter-offers on each of the approximately fifty transactions prior to June 20, 2001. In *Quaker State,* the seller "clearly rejected" the lower price set forth in the purchase orders by sending the buyer a new price list and then shipping the products with invoices reflecting these prices. By contrast, until June 19, 2001, Gage had sent no such notice to Henkel and shipped the products to Henkel with prices that matched the prices in Henkel's purchase orders. These circumstances show that Gage accepted the price set forth in Henkel's pre-June 20, 2001 purchase orders. *Cf. id.* at 1286 (observing that the seller's shipment in response to the buyer's purchase order did not constitute acceptance of the buyer's price because the seller had notified the buyer that it was rejecting the buyer's price before shipping). Accordingly, we affirm the district court's grant of summary judgment to Henkel with regard to the parties' pre-June 20, 2001 transactions.

---

[9]The court also found that the November 10 notice did not constitute a counter-offer to the buyer's two purchase orders that pre-dated November 10 because the notice indicated that the prices were subject to change without notice and that all orders were subject to the seller's confirmation. *Id.* at 1284. As a consequence, the buyer's assent could not consummate a contract, and the buyer's acceptance of the two mushroom shipments did not constitute an acceptance of the November 10 notice at the higher price. *Id.* at 1284-85.

## 2.    Conduct on or after June 20, 2001

On June 19, 2001, Gage informed Henkel that Gage expected to be paid for all products shipped at the unit prices that Gage had quoted to Henkel on March 13, 2001, which were based on the price increases Gage had proposed to Chrysler on November 9, 2000, but which Chrysler had not yet authorized. Beginning on June 20, 2001, Gage issued invoices for newly delivered products at the higher prices. On June 22, 2001, Henkel wrote back stating that it would pay only Gage's current Chrysler pricing and that "[t]hese prices shall not be adjusted without DaimlerChrysler-JNAP approval." Thereafter, Gage continued to ship products in response to Henkel's lower-priced purchase orders, which, consistent with Henkel's past purchase orders, stated, "HENKEL WILL ONLY PAY CHARGES LISTED ON THIS PO." Gage nevertheless followed up its shipments with invoices at the higher prices that Chrysler would not approve until August 26 and 29, 2001.

Gage argues that its course of dealing with Henkel, with the conflicting purchase orders and invoices, involved a classic "battle of the forms," which U.C.C. § 2-207, MICH. COMP. LAWS § 440.2207, governs. According to Gage, the parties' conflicting price terms were to be disregarded under § 2-207(3) in favor of a "reasonable" price per § 2-305 (providing that the parties "can conclude a contract for sale even though the price is not settled" and specifies how a "reasonable" price is to be set). The district court held, however, that § 2-207 did not apply to the post-June 19, 2001 transactions on the following grounds: (1) Comment 1 to § 2-207 indicates that the "purpose of the section is directed to the situation where the essential terms of the contract have already been agreed upon, but 'the letter expressed and intended as the acceptance or the closing of an agreement adds further *minor suggestions or proposals*....'" and (2) Henkel expressly made its purchase orders conditional on Gage's old prices. (J.A. 44.) (emphasis added by district court; quoting MICH. COMP. LAWS § 440.2207 Cmt. 1). We disagree.

First, the district court erred in relying on Comment 1 to U.C.C. § 2-207 to hold that the U.C.C. "battle of the forms" provisions do not come into play on the ground that a price change is not a minor suggestion or proposal. Comment 1 addresses only the situation of proposed *additions* to a contract that are contained in a responsive form, but says nothing about proposed *different* terms. *See* MICH. COMP. LAWS § 440.2207 Cmt. 1 (noting that one situation with which the section is intended to deal is "offer and acceptance, in which a wire or letter expressed and intended as an acceptance or the closing of an agreement *adds* further minor suggestions or proposals such as 'ship by Tuesday,' 'rush, 'ship draft against bill of lading inspection allowed,' or the like") (emphasis added). Comment 3 is more relevant to the facts in this case because it indicates that "[w]hether or not additional *or different* terms will become part of the agreement" depends upon the provisions of § 2-207(2). MICH. COMP. LAWS § 440.2207 Cmt. 3 (emphasis added). Comment 3 further explains that "[i]f [the different terms] are such as materially to alter the original bargain, they will not be included unless expressly agreed to by the other party." *Id.*; *see also id.* § 440.2207(2)(b) (providing that additional terms do not become part of the contract if they "materially alter it"). Although Gage's materially different price terms could not have become part of the parties' purported contract(s), U.C.C. § 2-207 instructs that "the terms of [those contracts] consist[ed] of those terms on which the writings of the parties agree[d], together with any supplementary terms incorporated under any other provisions of [the UCC]." *Id.* § 440.2207(3).

Second, the fact that Henkel made its purchase orders conditional on Gage's acceptance of its current prices also did not render § 2-207 inapplicable. U.C.C. § 2-207 instructs that, as with a proposed term that materially alters the contract under § 2-207(2)(b), an offeree's refusal to accept a conditional offer under § 2-207(2) does not preclude contract formation where the parties' conduct otherwise evidences an agreement. MICH. COMP. LAWS § 440.2207(3) ("Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract."); *see also id.* § 440.2204(1) ("A contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract.").

Here, Henkel submitted numerous purchase orders to Gage, Gage shipped products in response to those orders, and Henkel received and paid Gage for those shipped products (albeit not at the prices that Gage expected). This pattern of conduct creates a genuine issue of material fact as to whether the parties had one or more contracts for shipments on or after June 20, 2001. *See id.* § 440.2207 Cmt. 7 ("In many cases, as where goods are shipped, accepted and paid for before any dispute arises, there is no question whether a contract has been made. …The only question is what terms are included in the contract, and subsection (3) [of U.C.C. § 2-207] furnishes the governing rule."); *McJunkin Corp. v. Mechanicals, Inc.*, 888 F.2d 481, 488 (6th Cir. 1989) (holding that the parties' course of conduct established a contract where seller sent numerous shipments after receiving purchase orders from buyer and buyer paid for shipments); *Quaker State Mushroom Co.*, 635 F. Supp. at 1285 ("It is clear that the parties intended to have a contract, acted as if they had a contract, but had not agreed upon a price for the goods.… Sellers usually do not ship and buyers to not receive goods unless they think they have struck a deal."); *Benedict Mfg. Co. v. Aeroquip Corp.*, No. 242563, 2004 WL 1532280, at *4 (Mich. Ct. App. July 8, 2004) (unpublished) (holding that the parties' "behavior substantiates the existence of a contract because plaintiff manufactured the parts and supplied them to defendant on demand at a negotiated price when it received the purchase orders and releases"); *Southeastern Adhesives Co. v. Funder Am., Inc.*, 366 S.E.2d 505, 507-08 (N.C. Ct. App. 1988) (holding, pursuant to U.C.C. § 2-204(1), that parties had contracted for the shipment and delivery of urea resins each time the defendant would place a telephonic order and the plaintiff would ship the resin); *cf. Audio Visual Assocs., Inc. v. Sharp Elec. Corp.*, 210 F.3d 254, 260 (4th Cir. 2000) (holding that no contract was formed pursuant to U.C.C. § 2-207(3) or 2-204(1):    "the complaint does not allege that Sharp performed pursuant to the purchase order – it did not ship the goods to Audio Visual – and Audio Visual alleges no other conduct by either party to evidence a contract").

The district court held, as a matter of law, that the parties had contracts for shipments after June 19, 2001, but further held that Gage's mere shipment of goods in response to Henkel's purchase orders constituted an acceptance of the price terms in Henkel's offers. Although U.C.C. § 2-206(1)(b) provides that "an order or other offer to buy goods for prompt or current shipment shall be construed as inviting acceptance either by … the prompt or current shipment of conforming or nonconforming goods," that provision does not apply where the "language or circumstances … unambiguously indicate[]" otherwise. MICH. COMP. LAWS § 440.2206(1). Gage made it clear via its letter of June 19, 2001 and with each subsequent invoice that it would not consent to the price terms in Henkel's purchase orders. Thus, contrary to the district court, we hold that there is a genuine issue of material fact as to whether Gage's shipment of goods after June 19, 2001 manifested its assent to a contract containing the prices from Henkel's purchase orders.

An alternative view of the same facts suggests that the parties did not have a contract or a series of contracts after June 19, 2001. Arguably, Gage's invoices, which contained materially different price terms from Henkel's purchase orders, did not manifest "definite and seasonable expression[s] of acceptance" to those orders, pursuant to U.C.C. § 2-207(1). *Id.* § 440.2207(1). Under this view of the evidence, Gage's decision to ship products after June 19, 2001, followed by invoices reflecting different price terms, indicated an unambiguous rejection of the conditional offers in Henkel's purchase orders, thereby precluding contract formation. *See, e.g., United Foods, Inc. v. Hadley-Peoples Mfg. Co.*, 1994 WL 228773, at *5 (Tenn. Ct. App. May, 20, 1994) (unpublished) (finding no "seasonable expression of acceptance" where buyer sent numerous purchase orders for cotton and seller shipped cotton with a higher invoice price, because "'no contract is formed when the acceptance diverges significantly as to a material term'") (quoting *Howard Constr. Co. v. Jeff-Cole Quarries, Inc.*, 669 S.W.2d 221, 229 (Mo. Ct. App. 1983)); *cf. Mantaline*, 2000 WL 799337, at *4 (holding that seller's shipment of goods "without any contemporaneous disclaimer" in response to buyer's purchase order caused purchase order to ripen into a contract).

U.C.C. § 2-305 buttresses the view that the parties never formed a contract on the ground that they never intended to be bound without an agreement on price. *See* MICH. COMP. LAWS § 440.2305(4) ("Where …the parties intend not to be bound unless the price be fixed or agreed and it is not fixed or agreed there is no contract."). Gage's  shipments were "based on such fundamentally different [price] terms than those

proposed in the purchase orders," arguably manifesting the parties' intent not to be bound. *Quaker State*, 635 F. Supp. at 1286; *see also United Foods*, 1994 WL 228773, at *6 (finding no intent to be bound where seller shipped cotton to buyer along with invoices at prices higher than in buyer's purchase orders, because the dispute over the price of the cotton arose almost immediately after the buyer delivered the purchase orders); *In re Glover Constr. Co. v. Peyton*, 49 B.R. 581, 583-84 (Bankr. W.D. Ky. 1985) (holding that the parties did not intend to be bound, even though seller had signed the buyer's purchase order and had made a partial shipment, because immediately after executing the agreement the parties disputed the proper interpretation of the price/payment provisions; finding no contract between the parties under U.C.C. § 2-305(4)); MICH. COMP. LAWS § 440.2305, Cmt. 2 ("Under some circumstances the postponement of agreement on price will mean that no deal has really been concluded …. Whether or not this is so is, in most cases, a question to be determined by the trier of fact.").

In sum, the evidence of the parties' post-June 19, 2001 conduct, when viewed through the prism of U.C.C. §§ 2-204, 2-207, and 2-305, would support a finding either that (a) Gage accepted Henkel's purchase orders but proposed different price terms (contract formation with an open price term) or (b) Gage rejected Henkel's purchase orders (no contract formation). The remaining question is what prices Henkel was obligated to pay for goods it received from Gage after June 19, 2001. The answer to this question depends upon which view of the parties' post-June 19, 2001 conduct that the district court adopts after a trial.

If the district court finds that the parties' post-June 19, 2001 conduct recognized the existence of a contract or a series of contracts, U.C.C. § 2-207 explains that "[i]n such case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of this act." MICH. COMP. LAWS § 440.2207(3). Because the parties' writings expressly disagreed on price, the district court would look to the U.C.C.'s relevant gap-filling provision, which is U.C.C. § 2-305. *Id.* § 440.2305; *see also Quaker State Mushroom Co.*, 635 F. Supp. at 1285-86; *United Foods*, 1994 WL 228773, at *5.

U.C.C. § 2-305 provides that "[t]he parties if they so intend can conclude a contract for sale even though the price is not settled." MICH. COMP. LAWS § 440.2305(1). In such a case, "the price is a reasonable price at the time of delivery" if (a) nothing is said as to price; (b) the price is left to be agreed by the parties and they fail to agree; or (c) the price is to be fixed by a market standard or by a third party. *Id.* The first condition does not apply in this case. The parties did say something as to price; they just disagreed on that point.

The second and third conditions may apply, however. Despite their inability to agree on price, the parties began to transact business on May 29, 2001, suggesting that the parties had left the issue of price to be agreed at a later date. In addition, the following evidence suggests that Henkel agreed to honor any price increases that Chrysler, a third party, authorized: On May 16, 2001, Charles Schilling of Henkel promised Gage that if Chrysler awarded Gage the increased pricing, Henkel "will pay that"; on May 18, 2001, Joe Farren of Henkel sent Gage an e-mail stating, "If purchasing OK's a price increase we will certainly honor it"; on May 31, 2001, Farren orally agreed that Henkel would honor any new pricing that Chrysler approved; and on June 22, 2001, John Sloan of Henkel informed Gage that Gage's "prices shall not be adjusted without DaimlerChrysler-JNAP approval."

If Gage were to prove the application of either condition at trial, it would be entitled to the "reasonable price upon delivery" of products shipped to Henkel on or after August 26, 2001. MICH. COMP. LAWS § 440.2305(1). The reasonable price could be the prices Chrysler approved. Gage also would be entitled to the reasonable price upon delivery for products shipped to Henkel on or after June 20, 2001 but before August 26, 2001. The record, however, is unclear as to whether the reasonable price during this time-frame would be the Chrysler-approved prices, because Gage has not pointed the Court to any evidence that the parties agreed that the Chyrsler-approved price increases would be retroactive to the beginning of the TCM program.

Alternatively, the district court may find that the parties' post-June 19, 2001 conduct did not recognize the existence of a contract or a series of contracts because they did not intend to be bound until they agreed on price. In that event, Henkel would be obligated to pay the "reasonable value" of Gage's products at the time of delivery if Henkel could not return them. MICH. COMP. LAWS § 440.2305(4). The calculation of the reasonable value would take into account Henkel's purported promises, if found to have been made, to honor Gage's higher prices upon Chrysler's approval.

## C.     Gage's Misrepresentation, Fraud, and Fraud in the Inducement Claim

In support of its claim for misrepresentation, fraud, and fraud in the inducement, Gage alleges that Henkel representatives promised to pay Gage the prices equal to those Gage had quoted to Chrysler in November 2000 if Chrysler subsequently approved the increases. Gage claims that these promises were false when made, made in bad faith without intention of performance, and with the intent of inducing Gage to contract with Henkel and supply it with chemical products.

According to the Michigan courts:

> To establish a cause of action for fraud or misrepresentation, a plaintiff must prove (1) that the defendant made a material representation, (2) that the representation was false, (3) that when the defendant made the representation, the defendant knew that it was false, or made it recklessly without knowledge of its truth or falsity, (4) that the defendant made it with the intent that the plaintiff would act on it, (5) that the plaintiff acted in reliance on it, and (6) that the plaintiff suffered injury. *Baker v. Arbor Drugs, Inc.,* 215 Mich. App. 198, 208, 544 N.W.2d 727 (1996). An action for fraudulent misrepresentation must be predicated on a statement relating to a past or an existing fact. *Id.* at 208-209, 544 N.W.2d 727. Future promises are contractual and cannot constitute actionable fraud. *Id.*

*Eerdmans v. Maki*, 573 N.W.2d 329, 332-33 (Mich. Ct. App. 1997). Even if the representations are found to be promises of future action, however, they nevertheless are actionable if they were "made in bad faith without intention of performance." *Hi-Way Motor Co. v. Int'l Harvester Co.*, 247 N.W.2d 813, 816 (Mich. 1976) (citing *Crowley v. Langdon*, 86 N.W. 391 (1901)).

The district court found that Gage could not prove the fifth element of its fraud claim – that it relied on Henkel's promise to pay Gage's new prices if Chrysler approved them. The district court based its determination on the deposition testimony of Daniel Logan, Gage's Director of North American Automotive Operations, who testified as follows:

Q.     You knew that the [TCM] program was going to started [sic] approximately May 29, 2001, correct?
A.     Yes.
Q.     And you knew that there was no understanding at that time as to what prices were going to be paid, right?
A.     Right.
Q.     So at that point, was the decision made by Gage that look, we need to ship product because we don't want to disrupt our relations with Chrysler?
A.     Yes.
Q.     That was the sole basis of the decision to ship product?
A.     Exactly, because we didn't want to shut the plant down and jeopardize production.
                                        * * * *
Q.     … Take Chrysler out of the equation and assume that the Chrysler relationship is not at issue, that Henkel wanted these parts for its business, and assuming all the facts that you testified today to be the same, would you have shipped product to Henkel?
A.     Without them paying the appropriate price?

Q.     The same discussion would have come up with Ms. Paykina [who processed Gage's orders], where she comes to you and says these purchase orders are coming in from Henkel and they are not at the right prices, they are all over the map, you know, would you have shipped product to Henkel?

A.     No. I mean, you are assuming a lot of variables in there, of course.

The court found from this testimony that Gage did not rely on Gage's promise to pay Gage's new prices if Chrysler approved them, because Gage would have supplied its chemicals to Henkel regardless of Henkel's failure to honor those price increases.

Gage argues that the district court ignored Logan's testimony that Gage decided to ship products to Henkel not only to avoid shutting down the Plant, but also because "every indication was leading [Gage] to believe that [they] would get these price adjustments from DaimlerChrysler [and] there was every indication from the meeting that [he] had with Henkel that they said they would honor our price adjustments when that time came." (J.A. 377.) As to whether Gage would have shipped to Henkel had Chrysler not been in the equation, Gage points to Logan's further statement: "I mean, you are asking me to take out a huge portion of the equation and how would we react, when, in fact, I never really been in that position before. So how the company would respond or I would respond, you know, I don't know." (J.A. 380.)

We agree that it was inappropriate for the district court to find, as a matter of undisputed fact, that Gage's relationship with Chrysler was Gage's only consideration in deciding to ship. A review of Logan's complete testimony, including the excerpts Gage cites, suggests that Logan was equivocal and eventually professed that he did not know whether Gage would have shipped the products to Henkel if Chrysler had not been involved. Further, the other cited testimony of Logan, among other evidence, creates a genuine issue of material fact as to whether Henkel's purported misrepresentation about honoring the new prices exerted a material influence on Gage's decision to ship, even though it was not the sole, or even primary, influence. *See United States Fid. & Guar. Co. v. Black*, 313 N.W.2d 77, 86 (Mich. 1981) (holding that "the test for determining the existence of reliance is not whether the misrepresentation was the sole influence upon the complaining party in deciding to sign the agreement but rather is 'whether the … misrepresentation exerted a material influence upon the minds of (the complainants), although it might be only 1 of several motives, acting together, which produced the result.'") (quoting *Callihan v. Talkowski*, 124 N.W.2d 788 (1963)).[10]

With no analysis of the facts, the district court dismissed Gage's fraud claim on the alternative ground that Henkel's broken promise was a future promise that was contractual in nature, and therefore not actionable under a fraud theory. We disagree. Charles Schilling, Henkel's Sales Director, testified that he "would have taken whatever steps [he] needed to take to ensure" that Gage shipped its products and avoid a plant shutdown. (J.A. 144.) Gage argues, and we agree, that it is reasonable to infer that Schilling's desire to avoid a shutdown motivated his May 16, 2001 promise that if Chrysler awarded Gage the increased pricing, Henkel "will pay that." Consistently, on May 18, 2001, Joe Farren, Henkel's Chemical Manager at the Plant, sent Gage an e-mail stating, "If purchasing OK's a price increase we will certainly honor it," and on May 31, 2001, Farren orally agreed that Henkel would honor any new pricing that Chrysler

---

[10]Henkel cites to the June 19, 2001 letter from Randazzo to Sloan as further evidence that Gage's decision to ship products to Henkel was based solely on preserving its relationship with Chrysler. Although the letter does state that Gage "shipped the products so as not to cause any disruption in production" at the Plant, the letter goes on to explain that "Gage "expect[ed] to be paid for all products shipped" at the higher prices Gage quoted on March 31, 2001. (J.A. 777.) Thus, the letter is consistent with Gage's position that both its relationship with Chrysler and its expectation that it would be paid the higher prices factored into its decision to ship. Similarly, Henkel cites a February 13, 2002 letter from Randazzo that states, "[O]ur decision to supply was made strictly on the basis of maintaining our good business relationship with DaimlerChrysler as stated in my correspondence to Henkel dated June 19, 2001." (J.A. 1221.) As with the June 19, 2001 letter, this letter must be read in the context of Gage's expectation that it shipped with the expectation that Henkel would pay the higher prices. Although clearly not the sole factor, or necessarily the most important factor, in Gage's decision to ship, there is a genuine issue of material fact as to whether Henkel's promise to honor the higher prices materially contributed to Gage's decision.

approved.   The deposition testimony cited at page 39 of Gage's opening brief shows that, at the launch of the TCM Program, Henkel intended to pay all Tier II suppliers (like Gage) their then-current Chrysler pricing.  Because Chrysler had not yet deemed Gage's proposed higher prices to be the current pricing, Henkel's refusal to pay Gage those higher prices at the time does not in itself evidence bad faith.  However, once Chrysler approved Gage's higher pricing, Henkel, in fulfillment of its promise, arguably should have deemed the new pricing to be the current pricing.  It did not, which would permit an inference that, at the time the promises were made, Henkel did not intend to pay Gage its increased pricing once approved by Chrysler.  *See Hi-Way Motor*, 247 N.W.2d at 817 ("evidence of fraudulent intent, to come within the exception, must relate to conduct  of the actor 'at the very time of making the representations, or almost immediately thereafter'") (quoting *Danto v. Charles C. Robbins, Inc.*, 230 N.W. 188, 190 (Mich. 1930)).  Accordingly, the district court should not have dismissed the fraud claim on summary judgment.

## III.

For all the foregoing reasons, we **AFFIRM** the district court's grant of Henkel's motion for summary judgment regarding Gage's shipments to Henkel before June 20, 2001, but **REVERSE** the judgment with respect to shipments on or after June 20, 2001.  The case is **REMANDED** for trial.