**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**April 12, 2012**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

REPUBLIC BANK, INC., a Utah
Industrial Bank,

      Plaintiff-Appellee,

  v.

WEST PENN ALLEGHENY HEALTH
SYSTEM, INC., a Pennsylvania
Corporation,

      Defendant-Appellant.

No. 10-4145

(D.C. No. 2:08-CV-00934-DAK)
(D. of Utah)

---

**ORDER AND JUDGMENT**[*]

---

Before **TYMKOVICH**, **SEYMOUR**, and **GORSUCH**, Circuit Judges.

This case arises from a breach of contract claim that Republic Bank brought

against West Penn Allegheny Health Systems, alleging a failure to complete the

purchase of various medical components. After a bench trial, the district court

held that a contract had been formed and West Penn had breached the contract.

The court awarded damages to Republic.

---

    [*] This order and judgment is not binding precedent except under the
doctrines of law of the case, res judicata and collateral estoppel. It may be cited,
however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th
Cir. R. 32.1.

This appeal requires us to resolve two issues: (1) whether the district court erred in finding sufficient evidence the parties formed a contract; and (2) if so, whether the contract included a firm payment deadline that excused West Penn's performance.

Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we AFFIRM.

## I. Background

Republic is a Utah bank which acquired, through a lease default, several pieces of medical equipment—a CT scanner, a CT workstation, an ultrasound machine, and an ultrasound table—in the Pittsburgh, Pennsylvania area. West Penn is a large hospital system also located in the Pittsburgh area.

Republic held a lessor's interest in the medical equipment. It acquired the equipment after its borrower, Gamma Imaging Center, defaulted on an equipment lease. This default occurred after West Penn acquired the principals of Gamma. As part of its acquisition of Gamma, West Penn made certain promises and representations to Gamma that Gamma's liabilities would be taken care of, including the medical equipment and the lease on its building. As a result, West Penn was making lease payments on the building where the equipment was being housed and had access to it at all relevant times.

To facilitate selling the equipment, Republic hired Tetra Financial Services to market the equipment to potential buyers. Mark Loosli, a Tetra employee, was assigned to this task. In December 2007, West Penn expressed interest in

purchasing the equipment. West Penn engaged one of its usual contract negotiators, Michele Hutchison, to deal with the issue further. On February 13, 2008, Loosli, on behalf of Republic, offered to sell the CT scanner to West Penn for $750,000, and the ultrasound equipment for an additional $30,000. Loosli initially sent this offer to Gemstar, a broker he believed was representing West Penn at the time. Gemstar forwarded the email to West Penn and notified Loosli that he should deal directly with Hutchison. Loosli then called Hutchison and left her a voicemail asking her to return his call to discuss Republic's offer further.

Rather than returning Loosli's call, Hutchison sent Loosli an email on February 26, stating:

> We are interested in the 64 slice scanner, CT work station, ultrasound and ultrasound table.
>
> Our offer is as follows:
>
> Scanner - $600,000
> CT Workstation - $50,000
> Ultrasound and ultrasound table - $26,500
>
> If there is a good time for us to talk live, let me know.

R., Vol. II at 754.

Upon receiving her email, Loosli called Hutchison and they spoke by phone for the first time.[1] In this conversation, and several others over the following

---

[1] Though Hutchison's email was technically a counteroffer, the parties refer to it as an "offer" throughout the rest of their correspondence. For
(continued...)

week, they discussed whether Republic would need to provide a maintenance agreement for the CT Scanner and who would uninstall, move, and reinstall the CT scanner after sale. West Penn stated that no maintenance agreement would be necessary and that they would bear all costs relating to moving and installation. On March 4, 2008, Loosli emailed Hutchison stating that he had conveyed "your offer" to Republic's President, Boyd Lindquist, and that he hoped to have "something concrete in the next day or so." *Id.* at 756. This email also raised the possibility of substituting a new chiller (a required piece of equipment for running the CT machine) for the existing chiller as a favor to West Penn to save it time and cost.

On March 13, 2008, Loosli sent Hutchison an email stating:

> Michele: I met with the bank president this morning and he gave me approval to sell West Penn the 64 slice scanner, CT Workstation and Ultrasound unit with table for the total amount offered below [referring to Hutchison's February 26 email]. There is still some question regarding the cooler unit being moved to your location or left in place and a replacement provided for you. We can discuss that issue.
>
> Please let me know if you work through a purchase order system or if we need to put together a sales agreement.

*Id.* at 757. Hutchison sent an email to West Penn's executives the following day, stating that: "I have received notification from [Republic] that they have *accepted*

---

[1](...continued)
consistency's sake going forward, we will do the same.

*our offer* . . . . I will be speaking with them today to work out the details." *Id.* at 760 (emphasis added.)

On March 14, 2008, in an email to Loosli, Hutchison acknowledged that she had received his acceptance of her offer and she asked that he call her to discuss. During the subsequent phone conversation, in response to Loosli's question as to whether West Penn worked off of a purchase order system or if a sales agreement was required, the two agreed that Loosli would take the "laboring oar" in reducing their existing agreement to writing. On March 17, 2008, Loosli sent a draft agreement to Hutchison, directing her to call him "to discuss an[y] changes or additions you feel may be appropriate." *Id.* at 761. Loosli had handwritten the word "draft" on each of the agreement's pages.

The draft agreement provided that: "Buyer shall pay to the seller the sum of [$676,500] by wire transfer . . . on or before April 15, 2008." *Id.* at 763. A different provision made the transfer of title in the equipment "automatically effective without further action by Seller or Buyer upon payment in full of the Purchase Price." *Id.* Hutchison did not propose any changes to the draft.

Beginning on March 24, 2008, there were signs that West Penn was having second thoughts on the transaction. On that date Hutchison sent Loosli an email asking if Republic would consider selling the ultrasound separately from the CT scanner. Loosli inquired as to West Penn's motivations for the change, stating that "[w]e haven't been trying to market the CT since receiving your offer, which

-5-

we accepted." *Id.* at 770. Hutchison responded that West Penn was "[f]inalizing the budget for the CT. We are still interested in the CT." *Id.*

Loosli followed up on March 31, 2008, explaining that Republic desired to sell all of the equipment as a package and they would "like to tie in the sale of the ultrasound to the CT even if the sale is delayed for a short period rather than breaking them apart. . . . [W]e were given the impression the funding was in place or the offer you made, and we accepted, wouldn't have been made by West Penn." *Id.* at 773. Over the course of the next month, Loosli continued to press Hutchison to complete the transaction, but Hutchison was unable to do so.

On April 7, 2008, Loosli received an email offer from a third party inquiring about possibly purchasing the CT Scanner, the ultrasound, and an MRI machine located at the imaging center. Loosli responded that he did not think Republic would accept other offers until it heard back from West Penn regarding whether it would complete the purchase. Between March 13 and May 1, 2008, Loosli had similar communications with other potential buyers. Notably, on April 14, 2008, Loosli communicated the status of the purchase with Republic's President Boyd Lindquist, explaining the potential for missed opportunities, and wondering whether "we want to provide some kind of drop dead date or if we feel it is prudent to take a firm stand and state there is a contract in place and we expect them to honor it." *Id.* at 780.

On April 8, 2008, Hutchison emailed Loosli and asked whether there was "a deadline for us to purchase the equipment before it is put out there for sale to other potential buyers?" *Id.* at 779. Loosli responded on April 16, 2008 that there was no firm deadline for West Penn's performance, but that "[i]t is important to get this resolved as soon as possible," due to "lost opportunities" and the continued carrying costs being incurred by Republic. *Id.* at 782. Over the next few days, Loosli and Hutchison communicated via email and telephone, with Loosli continuing to reiterate that Republic understood there to be a contract in place for the sale of the medical equipment—a position that Hutchison did not attempt to correct or clarify.

On April 25, 2008, Hutchison communicated to Loosli that "I think part of the problem right now is that there is construction and moving of other equipment to fit this scanner into Forbes [hospital]." *Id.* at 789. Hutchison also stated that "if we cannot do this transaction I need to let you know so that [the CT Scanner] can be sold to someone else." *Id.*

On May 1, 2008, Dave Zimba, Vice-President for Corporate Contracts at West Penn, called Loosli. Zimba explained that he was aware of Loosli's prior dealings with Hutchison, but that West Penn was going to be unable to purchase the CT scanner at the current time. Zimba expressed interest in completing the transaction for the ultrasound machine, but Loosli explained that he would need to get Republic's approval to separate the items. Zimba explained that it was his

position that West Penn was not contractually bound to purchase any of the items because West Penn had not yet signed a purchase order or sales agreement. Loosli reiterated Republic's position that West Penn "had sent an email outlining what they wanted to purchase and the price they were willing to pay. We then sent back a few days later an acceptance of the offer without any material changes in terms or price." *Id.* at 796.

Based on this conversation and West Penn's apparent repudiation of the contract, Republic decided to auction the equipment in order to obtain fair market value. Republic engaged the services of a reputable auction house and the items were sold, resulting in net proceeds from the sale of the CT scanner and workstation of $350,303.76; a difference of $299,694.24 from the agreed upon price between West Penn and Republic.[2]

Republic initiated this litigation in Utah state court and West Penn removed the case to federal court. A two-day bench trial was held and written Findings of Fact and Conclusions of Law were entered, along with a judgment in favor of Republic on its breach of contract claim. *See* R., Vol. II at 905–42. In a subsequent order, the district court awarded damages of $299,694.24, along with prejudgment and post-judgment interest. *See id.* at 943.

---

[2] Since West Penn remained interested in purchasing the ultrasound machine separately, the suit only pertains to West Penn's breach with respect to the CT scanner and CT workstation. Ultimately, all the items at the imaging center were sold at auction to buyers other than West Penn.

## II. Jurisdiction

Before we can reach the merits, we must address a threshold jurisdictional question. The district court issued a judgment followed by an amended judgment that awarded prejudgment interest but did not specify the exact amount of interest to be paid. The disputed question is whether the amended judgment is "final" for the purposes of appeal since it did not specify the exact amount of interest to be paid by West Penn.

We "have jurisdiction of appeals from all final decisions of the district courts of the United States," 28 U.S.C. § 1291, "that is, those decisions that leave[ ] nothing for the court to do but execute the judgment." *Albright v. UNUM Life Ins. Co. of Am.*, 59 F.3d 1089, 1092 (10th Cir. 1995) (internal citation omitted). But under Federal Rule of Civil Procedure 58, a district court order determining liability without a calculation of damages in a "sum certain" fashion is not final, and therefore not appealable. *Id.*; *see* Fed. R. Civ. P. 58(b)(1)(B). Prejudgment interest is an element of damages, *Garcia v. Burlington N. R. Co.*, 818 F.2d 713, 721–22 (10th Cir. 1987), and must therefore be finally determined before appeal. But if the omission of the amount of prejudgment interest from the district court's judgment was merely a "clerical error," then "lack of technical compliance with Rule 58 will not preclude appellate review of that order," because it "in no way affects the finality of the judgment." *Pratt v. Petroleum Prod. Mgmt. Inc. Emp. Sav. Plan & Trust*, 920 F.2d 651, 656 (10th Cir. 1990).

-9-

"The [district] court may correct a clerical mistake . . . whenever one is found in a judgment, order, or other part of a record. . . . But after an appeal has been docketed . . . such a mistake may be corrected only with the appellate court's leave." Fed. R. Civ. P. 60(a).

Here, the fact that the amended judgment did not include the amount of the prejudgment interest awarded by the district court was simply a clerical error. The district court's initial order specified the interest rate to be applied by incorporating by reference the Utah statute enabling prejudgment interest. *See* R., Vol. II at 941 ("Pursuant to Utah Code Ann. § 15-1-1(2), [Republic] is entitled to prejudgment interest on $299,694.24 from May 1, 2008 until the date judgment is entered."); *see also* Utah Code Ann. § 15-1-1(2) ("[T]he legal rate of interest for the loan or forbearance of any money, goods, or chose in action shall be 10% per annum."). The amended judgment provided for the same damages award, but again neglected to actually calculate the interest. *See* R. Vol. II at 943. These facts are similar to those in *Pratt*, whereby "all parties proceeded as though the judgment . . . was final," and the only task remaining to the district court was to "quantify the judgment." 920 F.2d at 656. Additionally, both parties urge this court to grant the motion to allow the district court to correct its clerical mistake.

Accordingly, this court has jurisdiction to reach the merits of the appeal and will grant the motion to allow the district court to amend its clerical error.

-10-

# III. Discussion

West Penn contends the district court erred in two ways: first, in finding the parties had formed a contract; and second, if a contract existed, in failing to excuse West Penn's performance due to its failure to meet a firm "drop-dead" date for payment. We address each contention separately.

## A. Contract Formation

Where the formation of a contract is in dispute, state contract law controls. *Shoels v. Klebold*, 375 F.3d 1054, 1060 (10th Cir. 2004). Both Utah and Pennsylvania have adopted the Uniform Commercial Code (U.C.C.). *See* Utah Code Ann. § 70A-2-101 *et seq.*; Pa. C.S.A. § 2101 *et seq.* The U.C.C.'s sale of goods provisions in Articles 1 and 2 are applicable to the dispute here, and the parties agree that no material difference exists for purposes of this case whether we apply Utah or Pennsylvania law.

"Whether the parties had a meeting of the minds sufficient to create a binding contract is . . . an issue of fact, which we review . . . for clear error, reversing only where the finding is against the clear weight of the evidence, or if we otherwise reach a firm conviction that a mistake has been made." *LD III, LLC v. BBRD, LC,* 221 P.3d 867, 871 (Utah App. 2009) (internal citation omitted) (alterations in original); *In re Estate of Hall*, 731 A.2d 617, 621 (Pa. Super. Ct. 1999) ("When the trier of fact has determined the intention of the parties to an agreement, an appellate court will defer to the findings if the evidence supports

them."). Thus, we will uphold the district court's determination on issues of contract formation unless its determination was clearly erroneous.[3]

Under the U.C.C., "[a] contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract." U.C.C. § 2-204(1). This standard relies on "objective, observable manifestations of intent to contract," rather than the purely subjective intent of the parties. *Nat'l Envtl. Serv. Co. v. Ronan Eng'g Co.*, 256 F.3d 995, 1002 (10th Cir. 2001).

---

[3] West Penn argues that this court should apply a stricter standard of review because, in its opinion, the district court did not fulfill its duty to engage in rigorous fact-finding because it largely adopted the findings of fact and conclusions of law proposed by Republic. Aplt. Br. at 26–31. In support of this argument, West Penn points to our opinion in *Ramey Constr. Co., Inc. v. The Apache Tribe of the Mescalero Reservation, Inc.*, 616 F.2d 464, 466–68 (10th Cir. 1980), a case where we remanded for "significantly new, more detailed findings" after the district court adopted all but one of the defendant's proposed findings verbatim, except for "[m]inor changes . . . in capitalization, the wording (but not substance) of one conclusion of law . . . and the citation form for the Federal Rules of Civil Procedure." *Id.*

Despite West Penn's argument, the district court's findings below differ in several significant aspects from Republic's proposed findings: many of Republic's proposed findings were not adopted, others were adopted but modified in significant ways, and many of the district court's findings were not included in Republic's proposed findings at all. Accordingly, for purposes of determining the proper standard of review, we find that the district court's use of Republic's proposed findings reflects a considered and independent appraisal of the evidence, sufficient to enable this court to conduct a meaningful review of the district court's factfinding and reasoning. Thus, we will not depart from the clear error standard.

-12-

As evidence of this objective intent, the U.C.C. requires a signed writing for a sale of goods for a price of $500 or more. U.C.C. § 2-201(1). But the "required writing need not contain all the material terms of the contract . . . . [t]he only term which must appear is the quantity term . . . . [t]he price, time and place of payment or delivery, the general quality of the goods, or any particular warranties may all be omitted." *Id.* at § 2-201 cmt. 1. Neither party disputes that the emails in question are "writings" sufficient to satisfy the requirements of this provision.

Lastly, an offer and acceptance need not contain every term of the agreement. As long as they contain the essential terms of the agreement, a contract is formed even though the parties intend to adopt a formal document with additional terms at a later date. *Mazzella v. Koken*, 739 A.2d 531, 536 (Pa. 1999); *see also Helpin v. Trs. of the Univ. of Pa.*, 969 A.2d 601, 611 (Pa. Super. Ct. 2009) ("If the parties have agreed on the essential terms, the contract is enforcible even though recorded only in an informal memorandum that requires future approval or negotiation of incidental terms.").

### 1. West Penn's Offer

Uniform Commercial Code § 2-206(1)(a) provides: "(1) Unless otherwise unambiguously indicated by the language or circumstances (a) an offer to make a contract shall be construed as inviting acceptance in any manner and by any

medium reasonable in the circumstances."  This district court relied on

Hutchison's email to Loosli on February 26:

> We are interested in the 64 slice scanner, CT work
> station, ultrasound and ultrasound table.
>
> Our offer is as follows:
>
> Scanner - $600,000
> CT Workstation - $50,000
> Ultrasound and ultrasound table - $26,500
>
> If there is a good time for us to talk live, let me know.

R., Vol. II at 754.  This writing identifies the goods to be purchased and the price

to be paid.  It explicitly communicates an "offer."  The district court's finding

that this writing is an offer is not erroneous.[4]

### 2.  Republic's Acceptance

The district court also found that Republic accepted West Penn's offer.

The court based its finding on several pieces of evidence.  First, on March 13,

Loosli responded to Hutchison's offer via email:

---

[4]  At trial, West Penn argued that Hutchison lacked the authority to make a binding offer and she informed Loosli of that fact.  The district court found this argument not credible; instead, the evidence supported the conclusion that Hutchison had the authority to make offers of this type on behalf of West Penn. While West Penn reprises this argument in passing, Aplt. Br. at 7–8, it is not central to their appeal.  After reviewing the record, we are confident the evidence supports a finding that Hutchison had the authority to make the offer and see no reason to upset the district court's determination on this point.  *See also Luddington v. Bodenvest Ltd.*, 855 P.2d 204, 209 (Utah 1993).

> Michele: I met with the bank president this morning and he gave me approval to sell West Penn the 64 Slice Scanner, CT Workstation and Ultrasound unit with table for the total amount of $676,500 as offered below. There is still some question regarding the cooler unit being moved to your location or left in place and a replacement provided for you. We can discuss that issue.
>
> Please let me know if you work through a purchase order system or if we need to put together a sales agreement.

R., Vol. II at 757. The district court found that this message "was consistent with accepting an offer." *Id.* at 913. The district court also found that Republic, "on numerous occasions," communicated its understanding to West Penn that the email exchange created a binding contract, and that West Penn never objected to or attempted to correct this misunderstanding. *Id.* at 915. Therefore, the district court found that this email constituted sufficient acceptance to form a contract.

The existence of an acceptance is a case-specific inquiry committed to the factfinder. *Cal Wadsworth Constr. v. City of St. George*, 898 P.2d 1372, 1378 (Utah 1995) ("A trial court's finding about whether a party accepted an offer or a counteroffer is a finding of fact."). In determining the reasonableness of the manner and medium of acceptance, it is particularly probative whether the accepting party "accepted in the same manner and medium and during the same conversation in which [the] offer[] w[as] made." *Textron, Inc. v. Froelich*, 302 A.2d 426, 427 (Pa. Super. Ct. 1973). The accepting party need not use magic

-15-

words. *See, e.g.*, *id.* (finding that the words "Fine, Thank you" indicated acceptance). Significantly, if one party intends to foreclose a given method of acceptance, it bears an affirmative obligation to communicate that intent to the other party. U.C.C. § 2-206 cmt. 1 ("Any reasonable manner of acceptance is intended to be regarded as available unless the offeror has made quite clear that it will not be acceptable.").

Here, where West Penn communicated its offer by email, it invited a like response from Republic. But West Penn argues it is not immediately obvious that Republic's response manifested an acceptance. While the email clearly communicated that the deal had been approved by Republic's President, West Penn contends that does not necessarily equate to an *acceptance* of the deal, since competing interpretations of the language are possible.

But despite these possibilities, taken as a whole, the evidence convinced the district court that Republic's response was indeed intended as an acceptance, and that West Penn understood it as such. Republic's interpretation of West Penn's offer is illustrated by an email from Loosli to Republic's President on March 4, 2008 that stated, "We currently have a firm offer from West Penn . . . in the amount of $650,000 for the [scanner] and an additional $26,500 for the [ultrasound]." R., Vol. II at 755.

West Penn's interpretation of Republic's acceptance is revealed in subsequent emails between Hutchison and her superiors. On March 14, 2008,

following Republic's acceptance, Hutchison emailed her superiors at West Penn: "I have received notification from [Republic] that they have *accepted our offer* to purchase the Siemens 64 slice scanner for $600,000 and the Siemens workstation for $50,000. I will be working with them today to work out the details." *Id.* at 760 (emphasis added); *see also* U.C.C. § 2-204(3) (providing that even if one or more terms are left open, a contract for sale does not fail for indefiniteness if the parties have intended to make a contract). "The Uniform Commercial Code, its draftsmen mindful of the haste and sloppiness, and disregard for lawyerly niceties, that characterize commercial drafting, tolerates a good deal of incompleteness and even contradiction in offer and acceptance." R., Vol. II at 928 (quoting *Adani Exports Ltd. v. AMCI Export Corp.*, No. 05-304, 2007 WL 4298525, at *20 (W.D. Pa. Dec. 4, 2007) (quoting *Architectural Metal Sys., Inc. v. Consol. Sys., Inc.*, 58 F.3d 1227, 1230 (7th Cir. 1995))).

Perhaps most significantly, from the time of Republic's acceptance until West Penn repudiated the contract, Republic repeatedly communicated its understanding that a binding contract had been formed, and West Penn did not object, instead suggesting that its delay was due to issues with its internal budgeting processes, not its willingness to complete the transaction. *See, e.g.,* R., Vol. II at 770 (in response to Loosli's March 24, 2008 question of whether the delay was "a matter of generating a budget for the CT or is there a question whether [West Penn is] still interested," Hutchison replied, "[f]inalizing the

budget for the CT. We are still interested in the CT."). Additionally, Loosli specifically used the terms "offer" and "acceptance" in several emails to Hutchison after his initial acceptance; at no time did Hutchison attempt to correct any misunderstanding or push for further clarity. *See, e.g., id.* at 773 ("[W]e were given the impression that funding was in place or the offer you made, and we accepted, wouldn't have been made by West Penn."). The totality of this conduct convinced the district court that the parties had a meeting of the minds and intended by offer and acceptance to form a binding contract.

In response, Republic argues that the emails simply evidenced "an agreement to agree," "subject to execution of a formal document outlining acceptable terms." Aplt. Br. at 36. In support of this argument, they point to our opinion in *New York Life Ins. Co. v. K N Energy, Inc.*, 80 F.3d 405 (10th Cir. 1996). But the facts are distinguishable. The document in *New York Life* specifically stated: "[i]f the terms and conditions described above are acceptable to you, please so indicate by signing the enclosed copy of this letter in the place provided and returning the same to me." *Id.* at 410. The court found that the letter more clearly served the goal of "settling the terms of an agreement into which they formally proposed to enter," rather than "forming a binding and fully integrated agreement." *Id.* at 411 (internal quotation omitted). That conclusion has no bearing here. Hutchison clearly communicated an offer—specifically using the term "offer"—and Loosli communicated his acceptance.

-18-

Additionally, Republic points to *Herm Hughes & Sons, Inc. v. Quintek*, 834 P.2d 582 (Utah Ct. App. 1992), for the proposition that no contract existed because numerous terms remained open. In *Herm Hughes*, Quintek submitted a bid proposal, to which Herm Hughes responded by providing a supplier's agreement. The court concluded that there was no contract because the "supplier's agreement not only added additional terms, but directly contradicted Quintek's offer." *Id.* at 585. Quintek then immediately rejected Herm Hughes's supplier's agreement, in direct contradiction of Herm Hughes's demand that, "[i]f you're going to do the job you've got to sign our agreement." *Id.* These facts bear little resemblance to the issues in this case. Put simply, the question from Loosli as to whether "you work through a purchase order system or if we need to put together a sales agreement," is reasonably interpreted as nothing more than an inquiry into how West Penn would prefer to *memorialize* their already existing agreement. *See also Flight Sys., Inc. v. Electronic Data Sys. Corp.*, 112 F.3d 124, 129 (3d Cir. 1997) ("The fact that the parties intended subsequently to execute a signed writing does not preclude a finding that a contract was formed: if the minds of the parties met and the essential provisions of the contract were agreed upon, the contract was created, and the later writing is simply evidence of the agreement.").

Based on this record, we agree with the district court that sufficient evidence was presented at trial to support the conclusion that the parties intended

to form a contract. Accordingly, the district court's finding that the parties formed a contract was not clearly erroneous, and must be upheld.

### B. "Drop-Dead" Date

West Penn next argues that, even if a contract existed between the parties, the district court incorrectly interpreted a key term. Specifically, West Penn argues that its failure to meet a firm "drop-dead" date for payment of the equipment excused its performance of the contract. In other words, its failure to pay nullified the contract. We disagree.

"[T]he interpretation of the terms of a contract is a question of law for which our standard of review is de novo, and our scope of review is plenary." *McMullen v. Kutz*, 985 A.2d 769, 773 (Pa. 2009); *see also Selvig v. Blockbuster Enterprises, LC*, 266 P.3d 691,696 (Utah 2011) ("When a district court interprets a contract as a matter of law, we accord its construction no particular weight, reviewing its action under a correctness standard.") (quotation marks omitted).

By way of background, on March 17, 2008, four days after Republic accepted West Penn's offer, Republic emailed West Penn a draft sales agreement. The email asked West Penn to review the agreement and provide Republic with any "changes or additions you feel may be appropriate." R., Vol. II at 761. In addition to the price terms included in the initial email exchange, the draft agreement included a payment deadline of April 15, 2008.

West Penn argues that the terms of the draft agreement must be enforced as part of the contract. It further argues that the April 15, 2008 deadline specified in the draft agreement should be interpreted as a drop-dead date, meaning that if the transaction was not completed by April 15, the contract would be nullified and both parties would be excused from performance. Republic agrees that the terms of the draft agreement are part of the contract and enforceable. But Republic argues that the April 15 deadline is best interpreted as a payment deadline that West Penn breached, rather than a drop-dead date resulting in the nullification of the contract.[5]

The relevant portion of the agreement provides: "[s]ubject to the terms and conditions herein contained, Buyer shall pay to Seller the sum of Six Hundred Seventy-Six Thousand Five Hundred Dollars and No/00 ($676,500.00) (the "*Purchase Price*") by wire transfer in accordance with the wire instructions set forth below, without offset, deduction, or recoupment, on or before April 15, 2008." *Id.* at 763. Once payment was completed, Republic would "sell, transfer

---

[5] The parties agree that, if there is a contract at all, it includes the terms of the draft agreement. Generally, additional terms are considered suggestions for modification and are not incorporated into the agreement unless the other party explicitly assents. But under U.C.C. § 2-207, a contract "confirmation" containing additional terms becomes enforceable if the additional terms do not materially alter the contract, and if the other party does not object within 10 days. Since neither party contests the incorporation of the draft agreement into the contract, we need not consider whether the draft agreement constituted a "confirmation" or whether the April 15, 2008 deadline materially altered the contract.

and assign to Buyer, such sale, transfer and assignment to be automatically effective without further action by Seller or Buyer upon payment in full of the Purchase Price, all of Seller's right, title, and interest in and to the Equipment, free and clear of all liens and encumbrances." *Id.*

West Penn interprets this language as essentially creating an options contract—that is, West Penn had until April 15, 2008 to decide whether to go ahead with the purchase. In West Penn's view, its failure to provide payment by April 15 cancelled the contract, releasing both parties from any obligation to perform.

The contractual language does not bear the weight that West Penn's interpretation would put upon it, and was properly rejected by the district court. The language is of mutual promises to perform: West Penn promised to pay $676,500.00 on or before April 15, 2008; and in turn, Republic promised to give West Penn the equipment once payment was received. The language makes no mention of either party having an option to cancel the contract. The language relating to April 15, 2008 is simply that of an excusable deadline, not an immutable payment term.

Uniform Commercial Code § 2-309(1) provides: "[t]he time for shipment or delivery or any other action under a contract if not provided in this Article or agreed upon *shall be a reasonable time*" (emphasis added). The district court found that the parties "had not agreed upon a time for performance, and a

-22-

reasonable time for performance had not expired before" West Penn repudiated the contract. R., Vol. II at 930. Given that Hutchison had neither objected to nor signed the draft agreement prior to April 15, 2008, the district court did not clearly err in finding the U.C.C.'s "reasonable time" standard continued to govern up until the contract was breached. Since the record lacks any reference that Republic vacillated or refused to complete the transaction, we agree with the district court that the April 15 deadline was nothing more than a proposed deadline for performance and did not create an "options contract."

Furthermore, while it is possible that a drop-dead date provision can be implied, rather than expressly stated in the contract, to do so requires "the circumstances surrounding the transaction [to] show that timely performance was in fact essential." *Republic Nat'l Life Ins. Co. v. Red Lion Homes, Inc.*, 704 F.2d 484, 486 (10th Cir. 1983). Given that Republic was willing to consummate the transaction at any time, West Penn had continuous access to the CT machine, and nothing in the record indicates that there was a specific reason that required a performance deadline, an implied drop-dead date would be unreasonable on these facts.

While acknowledging that there is nothing special about the language of the draft agreement that should lead us to think it is anything other than a standard sales contract, West Penn insists that its interpretation is dictated by Utah precedent. *See Lee v. Barnes*, 977 P.2d 550 (Utah Ct. App. 1999). We disagree.

-23-

In *Lee,* the parties executed a real estate sales contract with a "Settlement Deadline" of April 30, 1997. *See id.* at 552. The deadline came and went without performance by either party. *Id.* On June 18, 1997, the buyer attempted to close the deal, and the seller refused, citing the Settlement Deadline. The buyer sued to enforce the contract. The court ruled in favor of the seller, finding that the seller had no obligation to perform after the Settlement Deadline. *Id.* at 553.

West Penn essentially argues that, under *Lee*, a lapsed deadline results in the release of the parties' obligation to perform. But this is too broad a reading of *Lee.* In *Lee*, the buyer breached its obligation to pay by the deadline and the court held that this breach released the seller from its obligation to perform. Here, the buyer—West Penn—also breached, but unlike *Lee,* it is the *seller*—Republic— that seeks to enforce the contract. It may be true that Republic, not West Penn, was released from its obligation to perform (though it continued to attempt to consummate the transaction), but that is because the contract stated that Republic's obligation was conditioned on West Penn's payment by the deadline. West Penn's obligation to pay was *not* conditioned on the occurrence of any other event.

It may be worth noting that, insofar as the record shows, West Penn never indicated in its internal or external communications that it understood the contract to include an April 15, 2008 drop-dead date. Furthermore, in an email sent from Hutchison to Loosli on April 8, 2008, she inquired whether there was "a deadline

for [West Penn] to purchase this equipment." R., Vol. II at 779. Loosli responded on April 16, 2008, one day after the purported drop-dead date, that "[i]t is important to get this resolved as soon as possible," due to "lost opportunities" and the continued carrying costs being incurred by Republic. *Id.* at 782. When West Penn ultimately communicated to Republic that it would not honor the contract, it did so by asserting that a contract had never been formed, making no mention of a lapsed deadline. Additionally, one day prior to April 15, 2008, Loosli communicated with Republic's President Lindquist and pondered whether "we want to provide some kind of drop dead date or if we feel it is prudent to take a firm stand and state there is a contract in place and we expect them to honor it." *Id.* at 780. In retrospect, it appears that neither party, *at the time of the transaction*, believed that a firm deadline for payment existed and that this theory was floated only once the deal fell apart.

While these facts do not control our interpretation of the contract, they increase our confidence that the April 15, 2008 term is correctly interpreted as a payment deadline rather than a drop-dead date, and the district court did not err in so finding.

## IV. Conclusion

For the foregoing reasons, we AFFIRM the district court's ruling and GRANT the appellee's motion to grant the district court leave to correct the

clerical mistake in the Amended Judgment.

Entered for the Court,


Timothy M. Tymkovich
Circuit Judge