NOT RECOMMENDED FOR PUBLICATION
File Name: 25a0254n.06

Case Nos. 23-3204/3237

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

FILED

May 19, 2025

KELLY L. STEPHENS, Clerk

BORGWARNER PDS IRAPUATO S. de R.L. de C.V.,

     Plaintiff-Appellant/Cross-Appellee,

v.

PARKER HANNIFIN CORPORATION,

     Defendant-Appellee/Cross-Appellant.

)
)
)
)
)
)
)
)
)
)
)
)

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO

O P I N I O N

___

Before: SILER, NALBANDIAN, and DAVIS, Circuit Judges.

NALBANDIAN, J., delivered the opinion of the court in which SILER, J., concurred. DAVIS, J. (pp. 19–26), delivered a separate dissenting opinion.

**NALBANDIAN, Circuit Judge**. It's often said that law school teaches a student how to think like a lawyer but doesn't impart much practical knowledge. But any law student who paid attention in first-year contracts is in luck because this case presents a classic "battle of the forms." A buyer and a seller began working together without a clear agreement governing their relationship. They exchanged quotes and purchase orders. They shipped and received goods. But both explicitly refused to submit to the other terms. For a few months that was not a problem. But when the price of raw materials rose, the seller, Parker Hannifin Corporation (Parker), requested a price increase. The buyer, BorgWarner PDS Irapuato (BorgWarner), refused, insisting that its terms did not require it to accept the new price. Parker responded that the terms of its contract controlled and allowed the increase.

From there, the battle ended up in court. The district court sided with Parker, concluding that its terms governed the agreement and allowed the price increase. But we disagree. Although Parker's quote and BorgWarner's purchase orders did not create an enforceable contract, their conduct did. So we reverse and remand for the district court to figure out what the terms that govern their contractual relationship are.

**I.**

**A.**

*Initial Agreement.* BorgWarner is an automotive supplier based in Mexico that ships parts directly to car manufacturers. In 2021, BorgWarner sought an agreement to buy bonded pistons from Parker, an Ohio corporation. BorgWarner would use the pistons to create clutches that it shipped to Ford Motor Company for use in its Ohio assembly plant. Parker sent BorgWarner a price quote on February 4 ("February Quote") for the two parts BorgWarner requested: Part No. 181220BD and Part No. 181550PST (together, "Parts"). The February Quote had descriptions of the Parts, pricing based on BorgWarner's estimated annual use, minimum quantities, tooling costs, and payment information. The bottom of the quote said that the "[q]uotation is tentative and subject to change pending entire review of purchase order and any additional specific requirements not presented in RFQ package at time of quotation." R.10-2, Price Quotation, p.3, PageID 203. It also included some terms, like that the quote was valid for 60 days, but referred to the "Seller's Offer of Sale" for Parker's full terms. *Id.* Parker's Offer of Sale was attached to the quote. As relevant here, paragraph two provided the following:

> **2. Terms**. All sales of Products by Seller are *expressly conditioned upon, and will be governed by the acceptance of, these Terms*. These Terms are incorporated into any Quote provided by Seller to Buyer. Buyer's order for any Products whether communicated to Seller verbally, in writing, by electronic data interface or other electronic commerce, shall constitute acceptance of these Terms. Seller objects to any contrary or additional terms

> or conditions of Buyer. Reference in Seller's order acknowledgement to Buyer's purchase order or purchase order number shall in no way constitute an acceptance of any of Buyer's terms or conditions of purchase. No modification to these Terms will be binding on Seller unless agreed to in writing and signed by an authorized representative of seller.

*Id.* at p.9, PageID 209 (emphasis added).

BorgWarner responded to the quote on February 10 with a Letter of Intent. That letter had a clause saying that "[a]ny legal obligations between the parties shall be only those set forth in an executed Purchase Order with Terms and Conditions." R.10-4, Letter of Intent, p.2, PageID 217. And included a link to BorgWarner's terms. Parker crossed out that clause and BorgWarner's terms, signed the letter, and returned it to BorgWarner via email. On February 23, Parker emailed BorgWarner that it completed BorgWarner's new customer setup and again attached its own terms. On February 27, BorgWarner sent a release schedule for the parts. Parker did not reply, so BorgWarner followed up several times, stating: "Please confirm if you see any issue to provide my requirements. I need your urgent response." R.10-6, Emails, pp.3–5, PageID 225–27. Parker responded two days later on March 11, 2021, confirming that BorgWarner's order was received and asking for shipping instructions. Parker again sent its terms.

On March 19, BorgWarner emailed Parker with questions about the quote. The email did not discuss any terms. It's unclear what, if any, conversation happened in the interim, but on April 9 BorgWarner emailed Parker a purchase order "[r]egarding the discussion and agreement" on the Parts. R.10-9, Emails, p.3, PageID 236. The purchase order, also called the Master Agreement, differed significantly from Parker's February Quote.[1] For one, Parker's Quote was based on fixed

---

[1] The Initial Master Agreement, referenced here, was not entered into the record before the district court, but later BorgWarner issued a Revised Master Agreement, that was entered into the record. The parties agree that the Initial Master Agreements and the Revised Master Agreements are identical except that the Revised Master Agreements had an updated, agreed-upon price.

quantities, while BorgWarner's Master Agreement established a requirements contract that "cover[ed] 100% of BorgWarner[']s requirements for [the] identified part unless terminated by [BorgWarner]." R.1-1, Revised Master Agreement, p.2, PageID 12. The Master Agreement also had its own delivery terms and a clause about governing terms that said:

> 1. This Purchase Order and any underlying Releases are *solely governed by and subject to the BorgWarner Purchase Order Terms and Conditions . . .* which are incorporated into this Purchase Order and all Releases by this reference. Acceptance of this Purchase Order and any supply of goods under this Purchase Order is limited to the specific terms of this Purchase Order and *any other different or additional terms proposed by Supplier are deemed material and are objected to and rejected by BorgWarner* unless specifically agreed to in writing signed by an authorized representative of BorgWarner. Any reference to Seller's quote is solely for the purpose of incorporating the description and specification of the good and services contained therein to the extent that such description and specification do not conflict with the description and specifications in this Purchase Order or Release.

*Id.* at p.3, PageID 13 (emphasis added).

The "Purchase Order Terms and Conditions" reaffirmed that these terms and conditions "are binding and have the purpose of governing the general terms and conditions" for the sales relationship. R.1-2, Purchase Order Terms and Conditions, p.2, PageID 17. It also provided that the seller could accept the terms either through written acceptance of the purchase order or commencement of performance. *Id.* And any terms proposed by the seller that were different or on top of BorgWarner's were "expressly rejected." *Id.* Regarding price, the terms said that the order "must not be filled at prices higher than those specified on the Purchase Order" and BorgWarner had "no responsibility for any increased costs incurred by Seller in connection with any raw materials or subcontractors" unless those higher prices or costs were negotiated and confirmed in writing. *Id.*

Parker responded to BorgWarner's email and Master Agreement acknowledging that BorgWarner's purchase order was "received and processed." R.10-9, Emails, p.2, PageID 235.

4

But the email also told BorgWarner to "see attached quote and Parker Terms and Conditions." *Id.* Despite the differences in the terms exchanged, BorgWarner and Parker continued performance on this quote/purchase order/release/acknowledgment cycle.

*Price Increase.* In June 2021, Parker sent BorgWarner a letter letting it know that Parker was increasing prices on orders and shipments beginning after August 2021. According to Parker, the increase was driven by "inflationary business challenges which include raw materials, freight, labor, energy, and insurance costs." R.10-10, Price Increase Letter, p.2, PageID 239. It also issued an updated quote for the "price adjustment . . . only" and attached its terms. BorgWarner responded with a letter objecting to the price increase, reminding Parker that BorgWarner's terms controlled, that those terms prevented Parker from raising the price without written acceptance from BorgWarner, and that BorgWarner was not responsible for increased costs. So the parties negotiated.

In November, Parker and BorgWarner agreed that, dating back retroactively to October, BorgWarner would cover the increase in only the raw material prices and Parker would delay any further cost increase until January 1, 2022. The parties seemingly agreed to base the raw material price increase on a specific metal index, which would be reviewed quarterly and measured against the three-month-average price. But on November 26, 2021, BorgWarner told Parker it would "not accept[]" the proposed price for January 2022 and "only agreed on the October 1st price." R.1-3, Email, p.2, PageID 29. With that, BorgWarner sent a Revised Master Agreement reflecting the October 1 unit price increase from $3.941 to $7.323. The agreement had the same terms attached as the Initial Master Agreement. Despite their continued disagreement on the price, BorgWarner continued to order the Parts and Parker continued to ship them.

5

On January 10, 2022, Parker both emailed BorgWarner to say the new, higher price would take effect, and sent a Notice of Termination because they were "at an impasse" over the price increase. R.1-5, Notice of Termination, p.2, PageID 41. The notice explained that because BorgWarner had not sent a purchase order with new pricing, Parker was terminating the agreement as of February 14, 2022, but it would maintain an uninterrupted supply until that date based on the January 2022 prices. *Id.* BorgWarner replied that it was "open to negotiat[ing]" but would only pay the October 2021 price. R.10-16, Emails, p.2, PageID 251. Parker replied on January 24 that it "will not be able to negotiate further" and intended to charge BorgWarner the January 2022 prices. R.10-17, Emails, p.2, PageID 253.

BorgWarner responded with a letter on February 1 accusing Parker of "not acting in good faith" by "unilaterally attempt[ing] to impose a price increase." R.1-6, Resp. to Notice of Termination, p.2, PageID 43. It also reiterated that the companies' agreement was governed by BorgWarner's terms which bound Parker to "continue supplying the Parts at the prices, payment, and delivery terms outlined in the Purchase Orders." *Id.* at p.3, PageID 44. BorgWarner also pointed to its terms to reject any insinuation that Parker's terms governed the relationship. Finally, BorgWarner let Parker know that it considered Parker in breach of contract and expected Parker to cover any costs of shutting down BorgWarner's manufacturing line if the Parts were not shipped. To that end, BorgWarner sought immediate assurance that Parker would not stop shipment and would honor its contractual obligations.

Because the parties had continued working together without explicitly agreeing on the terms that would govern their relationship, who was in breach and why became the subject of dispute. Parker responded that it was not acting in bad faith given the "lengthy notice" and "transparent communication" it had provided. R.1-7, Parker Resp. Letter, p.2, PageID 46. Parker

6

acknowledged that there was "no signed long-term supply agreement between the parties" because of the quote/purchase order/release/acknowledgment nature of their relationship. *Id.* But it explained that its Offer of Sale, which was attached to the February Quote, expressly conditioned any relationship on acceptance of its terms. So Parker claimed that its terms governed, and that those terms reserved its right to increase prices with adequate notice, which is exactly what it had done. BorgWarner replied that Parker's terms did not govern the agreement because BorgWarner's Purchase Order Terms and Conditions expressly rejected any terms different from or on top of those contained in the purchase order. Parker responded reiterating its belief that its terms governed. Parker also asserted that BorgWarner had an amount due on its account and Parker would only continue to ship products to BorgWarner on a cash basis.

In March, Parker again told BorgWarner that if it did not pay its outstanding balance, it could only receive shipments on a cash basis. Less than a week later, BorgWarner paid Parker about $336,000 of its outstanding invoices but left a $50,000 balance that represented the difference between the October 2021 price and the January 2022 price for all Parts delivered after January 1. BorgWarner sued Parker a week later.

**B.**

BorgWarner sued Parker in federal court under diversity jurisdiction asserting claims for breach of contract and declaratory judgment. BorgWarner alleged that Parker had violated its obligations under the Revised Master Agreement and sought damages. It also sought a declaration that the Revised Master Agreement's terms governed and that Parker had to continue supplying BorgWarner the Parts at the originally agreed-upon prices. BorgWarner also moved for a temporary restraining order and preliminary injunction to require Parker to continue shipping the Parts. The court denied the motion.

7

Parker counterclaimed. It argued that BorgWarner had breached its terms, which governed the relationship. Parker demanded that BorgWarner pay the balance on its account and claimed Parker was entitled to recover attorneys' fees under the indemnification clause in its terms. In April, BorgWarner paid the balance on its account "under protest" and continued to dispute that Parker's terms governed the relationship. R.25, Am. Countercl., p.8, PageID 452. So Parker amended its counterclaim to remove the payment demand but to continue seeking declaratory judgment that its terms governed, that the January price increase was in effect, and that it was entitled to attorneys' fees. Both parties moved for summary judgment.

The district court granted summary judgment to Parker on all claims except the request for attorneys' fees. Applying Ohio law, the court found that Parker's February Quote, and the terms attached to it, dictated the parties' relationship. To get there, the court made four conclusions:

> (1) Parker's February 4, 2021 quote explicitly stated that an order by [BorgWarner] would constitute acceptance of Parker's terms and conditions; (2) Parker struck language from [BorgWarner's] letter of intent that would have incorporated [BorgWarner's] terms and conditions; (3) the record was devoid of any evidence suggesting that [BorgWarner] conditioned its acceptance of Parker's offer on the ground that Parker assent to [BorgWarner's] terms and conditions; and (4) Parker had presented evidence demonstrating that it consistently informed [BorgWarner] that its quotes were subject to Parker's terms and conditions.

R.34, Order, p.7, PageID 689. Because Parker's terms governed, it had the power to change its price at any time and for any reason, so long as it provided 60 days' notice. And that's what it did. So BorgWarner breached by refusing to pay the increased price in January 2022. Still, the court denied Parker's request for attorneys' fees because the parties did not specifically negotiate the indemnification provision, as required for enforcement under Ohio law. The parties cross-appealed: BorgWarner the grant of summary judgment for Parker, and Parker the denial of attorneys' fees.

8

**II.**

We review a summary-judgment grant de novo. *McKenna v. Dillon Transp., LLC*, 97 F.4th 471, 474 (6th Cir. 2024). Summary judgment is proper if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ P. 56(a). When "parties filed cross-motions for summary judgment, the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Honeywell Int'l, Inc.*, 954 F.3d 948, 954 (6th Cir. 2020) (internal quotation marks omitted).

Because this court's subject-matter jurisdiction is based on diversity, the substantive law of the forum state governs. *Cash-Darling v. Recycling Equip., Inc.*, 62 F.4th 969, 974 (6th Cir. 2023). The parties agree Ohio law applies. And Ohio has adopted Article II of the Uniform Commercial Code (UCC), which governs transactions involving the sale of goods. *Int'l Periodical Distribs. v. Bizmart*, 768 N.E.2d 1167, 1168 (Ohio 2002).

**III.**

So whose terms govern this relationship? According to BorgWarner, the terms attached to its Revised Master Agreement govern. And those terms prevent Parker from unilaterally increasing its prices. According to Parker, the terms attached to its quote and sent to BorgWarner via email govern. And those terms permit price increases at any time for any reason.

A contract is formed with an "offer, acceptance, and consideration." *Dyno Const. Co. v. McWane, Inc.*, 198 F.3d 567, 572 (6th Cir. 1999) (applying Ohio law). To create an enforceable contract, there must also be a "meeting of the minds as to the essential terms." *Kostelnik v. Helper*, 770 N.E.2d 58, 61 (Ohio 2002). To be valid, the "contract must . . . be specific as to its essential

terms, such as the identity of the parties to be bound, the subject matter of the contract, consideration, a quantity term, and a price term." *Alligood v. Procter & Gamble Co.*, 594 N.E.2d 668, 669 (Ohio Ct. App. 1st Dist. 1991). But these terms need not be spelled out in a formal writing. "A contract for the sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract." *Extreme Mach. & Fabricating, Inc. v. Avery Dennison Corp.*, 49 N.E.3d 324, 328 (Ohio Ct. App. 7th Dist. 2016); *see also* Ohio Rev. Code Ann. § 1302.07(A). The terms of a contract by conduct "consist of those terms on which the writings of the parties agree and any UCC supplemental terms." *Avery*, 49 N.E.3d at 328.

### A.

It all starts with an offer—a "manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." *Id.* at 329–30 (internal quotation marks omitted); *see also* Restatement (Second) of Contracts § 24 (Am. L. Inst. 1981). According to Parker, its February Quote was an offer, BorgWarner accepted that offer with its purchase orders, and so Parker's terms govern.

We start with the February Quote. Typically, a seller's quote is not an offer, but instead an invitation for the buyer to make an offer, usually through a purchase agreement. *Dyno*, 198 F.3d at 572. But that's not always true. A quote can be an offer if it's reasonably apparent "from the price quotation that assent to that quotation is all that is needed to ripen the offer into a contract." *Id.* (quoting *Quaker State Mushroom Co. v. Dominick's Finer Foods, Inc.*, 635 F. Supp. 1281, 1284 (N.D. Ill. 1986) (applying UCC under Illinois law)). A quote that equates to an offer is usually detailed and personalized to the buyer, rather than generalized or boilerplate. *Id.* Ultimately though, it's an intent question: whether the party providing the quote (usually the seller)

10

intended it to create a binding contract that the buyer could consummate merely by accepting, or if the seller intended the quote to serve as an invitation to negotiate. *Id.* To evaluate the seller's intent, we assess "the writing as well as the objective evidence surrounding its creation." *H & M Landscaping Co. v. Abraxus Salt, LLC*, No. 94268, 2010 WL 3441935, at *2 (Ohio Ct. App. 8th Dist. 2010).

When assessing the writing, the terms must show that "only the buyer's assent [is] necessary to form a binding contract." *Avery*, 49 N.E.3d at 330. "The more terms the parties leave open, the less likely it is that they have intended to conclude a binding agreement." U.C.C. § 2-204 cmt. (LexisNexis) (Am. L. Inst. & Nat'l Conf. of Comm'rs on Unif. State L. 2025). An "estimate," for example, will almost never be an offer "because it is only an approximation of the price which eliminates the very concept of commitment." 1 Corbin on Ohio Contracts § 2.04(2), LexisNexis (2019) (citing *Atelier Design, Inc. v. Campbell*, 589 N.E.2d 474, 477–78 (Ohio Ct. App. 2d Dist. 1990) (finding no contract based on an estimate that permitted additional changes at the parties request)). Likewise, a quote that says the listed prices are "subject to change" and contingent upon the seller's confirmation does not constitute an offer. *Quaker State Mushroom*, 635 F. Supp. at 1284.

Next, the context. For that, we look outside the quote to the words and circumstances surrounding the quote's exchange. *MLMC, Ltd. v. Airtouch Commc'ns, Inc.*, 215 F. Supp. 2d 464, 477 (D. Del. 2002) (looking to general contract law and citing Richard A. Lord, Williston on Contracts § 4:7, at 291 (4th ed. 1990)). If the quote is sent without language saying that an offer is being made and that the buyer merely needs to accept it, it is probably not an offer. *Dyno*, 198 F.3d at 572 (citing *Interstate Indus., Inc. v. Barclay Indus., Inc.*, 540 F.2d 868, 873 (7th Cir. 1976) (applying UCC under Indiana law)). And even a detailed proposal that invites the buyer to review

the quote and reach back out to the seller for further discussion based on it indicates that the quote is still an invitation for further negotiation rather than an offer. *Babcock & Wilcox, Co. v. Hitachi Am., Ltd.*, 406 F. Supp. 2d 819, 829 (N.D. Ohio 2005). Similarly, if later communications between the parties indicate the quote was just the starting point of negotiations and "open issues" remained, it was likely not intended to be an offer but an invitation to negotiate. *Compare id*. at 829–30, *with H & M*, 2010 WL 3441935, at *3 (finding quote was an offer when it came after "the parties had engaged in significant negotiations").

These factors make logical sense. Imagine that a seller provides a buyer with a detailed quote after an initial discussion, but that quote only provides estimates based on the buyer's predicted need and has terms saying it is subject to change and contingent on the seller's confirmation. In an email with the quote, the seller tells the buyer to reach out for further discussion. The buyer, finding the price to be a great deal, sends the seller a purchase order for a quantity far above the amount listed in the estimate. But just before the seller receives the order, the price of raw materials skyrockets. The seller would be within its rights to reject the purchase order and send a new quote; the terms and context make that clear. So the buyer's acceptance alone is not enough to "consummate the contract." *Quaker State Mushroom*, 635 F. Supp. at 1284. It is the purchase order—not the quote—that creates the "power of acceptance" or rejection. *Id.* So the quote was not an offer.

Applying those principals here, it is clear Parker's quote was not an offer. First, look to the writing itself. It provides a price based on estimated annual use and minimum shipping quantities. R.10-2, Price Quotation, p.3, PageID 203. These provide, at best, only an approximation of the price. And the terms say the "[q]uotation is tentative and subject to change pending entire review of purchase order and any additional specific requirements not presented in

12

RFQ package at time of quotation." *Id.* So it both provides an estimate and says it is subject to change. These are telltale signs from the language of the quote that it was not an offer.

Parker argues that this language doesn't mean that its quote wasn't an offer, just that it had reserved the right to modify the quote if BorgWarner "issue[d] a purchase order with different product specifications, delivery locations or other requirements." Parker 2d Br. at 29. But Parker reserved the right to change the quote, not just in the case of new requirements but also "pending entire review of [the] purchase order." R.10-2, Price Quotation, p.3, PageID 203. This language effectively made the purchase order contingent upon Parker's confirmation that the quoted price still applies. So the original quote, standing alone, could not be an offer.

The context also suggests the quote was only intended to be the starting point of their negotiations. Parker's email with the quote instructed BorgWarner to review it and "let [them] know if you have any questions." *Id.* at p.2, PageID 202. And ended with Parker's representative saying he "look[s] forward to working with you." *Id.* None of this language invites BorgWarner to immediately accept an "offer." And subsequent communications confirm this was only the start of the parties' negotiations, not the end. BorgWarner responded with a letter of intent. Parker responded by crossing out BorgWarner's terms. From there, the parties continued emailing back and forth about the release schedule, shipping instructions, and questions BorgWarner had about the quote, indicating there were open issues to be negotiated after Parker sent the quote. BorgWarner did not send a purchase order until over two months later after following up on their "discussion and agreement." R.10-9, Emails, p.3, PageID 236. And it differed significantly from Parker's February Quote.

So though the quote was detailed and specific to BorgWarner, both the language and the context make clear Parker did not intend the quote to be an offer. To further illustrate this, imagine

that BorgWarner had responded to Parker's price quote with a purchase order and then Parker realized the costs to fulfill the order were higher than expected. Because the "tentative" quotation is "subject to change pending entire review of purchase order," Parker could refuse to ship the Parts and send a new quote. So BorgWarner could not have created a binding agreement by accepting. *See Studebaker v. Staudter*, No. 15508, 1996 WL 491795, at *3 (Ohio Ct. App. 2d Dist. Aug. 30, 1996) ("The manifestation must be clear enough to justify another person's understanding that assent to that bargain is invited and will conclude it."). It was Parker who had the power of acceptance upon receipt of the purchase order. So the quote could not have been the offer.

But even if the quote were an offer, BorgWarner did not accept it. A written confirmation does not operate as an acceptance if "acceptance is expressly made conditional on assent to additional or different terms." Ohio Rev. Code Ann. § 1302.10(A). The standard is whether the alleged acceptance "clearly reveal[s] that the offeree is unwilling to proceed with the transaction unless he is assured of the offeror's assent to the additional or different terms." *SST Bearing Corp. v. MTD Consumers Grp., Inc.*, 2004-Ohio-6435, ¶ 20–23 (Ohio Ct. App. 1st Dist. 2004) (alteration omitted) (quoting *Dorton v. Collins & Aikman Corp.*, 453 F.2d 1161, 1168 (6th Cir. 1972)).

That's what BorgWarner communicated. The BorgWarner purchase orders provided: "Acceptance of this Purchase Order and any supply of goods under this Purchase Order is limited to the specific terms of this Purchase Order and any other different or additional terms proposed by Supplier are deemed material and are objected to and rejected by BorgWarner unless specifically agreed to in [a signed] writing." R.1-1, Revised Master Agreement, p.3, PageID 13. In other words, BorgWarner said it wasn't going forward with the contract on any terms except its own.

BorgWarner's purchase orders did not form a contract on Parker's terms for a third, independent reason: as noted, a contract requires a "meeting of the minds as to the essential terms." *Kostelnik*, 770 N.E.2d at 61. But BorgWarner's purchase orders and Parker's quote disagreed on one of the most fundamental elements: the quantity term, and (through that) the type of contract being formed. BorgWarner's purchase orders were requirements contracts for "100%" of BorgWarner's needs. R.1-1, Revised Master Agreement, pp.2, 4, PageID 12, 14. Parker's quotes listed an estimated annual use and a minimum shipping amount. R.10-2, Price Quotation, pp.3–8, PageID 203–08. A requirements contract demands exclusivity. *H & C Ag Servs., LLC v. Ohio Fresh Eggs, LLC*, 41 N.E.3d 915, 924 (Ohio Ct. App. 3d Dist. 2015). And Parker concedes that its contract lacked this exclusivity. Parker 2d Br. at 58. So there was no meeting of the minds on the essential quantity term and the contract thus fails for indefiniteness. *H & C Ag Servs.*, 41 N.E.3d at 927.[2]

Parker's February Quote was not an offer. And if it were, BorgWarner did not accept it. Plus, the divergent quantity terms indicate there was not a meeting of the minds necessary to create a contract. So the district court erred in concluding Parker's terms governed the agreement.

---

[2] Parker argues that its figures were estimates and that industry practice commonly relies on such estimates for the necessary quantity term, so the quantity terms were not actually divergent. For support, Parker relies on *Dicastal North America v. Markowitz Metals Group*. Parker 2d Br. at 38 (citing 633 F. Supp. 3d 999, 1016 (W.D. Mich. 2022)). But that case is meaningfully different on the facts. There, the parties had "acknowledged the quantities provided in the Proposal" so there was evidence "as to the formation of a contract based on the Proposal." *Id*. There is no similar evidence that BorgWarner and Parker agreed on the quantity terms or that there was an industry practice to establish quantity terms through estimates. Instead, the evidence shows that the parties *did not* agree—BorgWarner's requirements contract demanded exclusivity which Parker's contract lacked. So even if Parker was providing estimates—as may be common in the automotive industry—there was no meeting of the minds on the quantity, so the contract fails for indefiniteness. *H & C Ag Servs.*, 41 N.E.3d at 927.

**B.**

Does that mean BorgWarner's terms govern? Not quite. If we construe BorgWarner's Initial Master Agreement as an offer, Parker also expressly conditioned acceptance on its own terms by attaching its terms in a later email. R.10-6, Emails, p.2, PageID 224. Those terms specifically provided: "All sales of Products by Seller are expressly conditioned upon . . . these Terms." R.10-2, Price Quotation, p.9, PageID 209. As of June 2021, BorgWarner had not agreed to Parker's terms, and Parker had not consented to BorgWarner's terms. So there is no reason to think the terms of BorgWarner's Initial Master Agreement governed their relationship.

BorgWarner asserts that the terms of the Revised Master Agreement that it sent in November 2021 should control because after it issued the revised agreement "negotiations ceased," "Parker did not object," and Parker shipped goods. BorgWarner 3d Br. at 13. Shipment can constitute acceptance in some cases, but that is only true if "otherwise unambiguously indicated by the language or circumstances." Ohio Rev. Code Ann. § 1302.09(A)(2).

Such unambiguous language and circumstances are missing here. To start, Parker consistently made clear it would not contract with BorgWarner under BorgWarner's terms. *See* R.10-2, Price Quotation, p.9, PageID 209 (rejecting any contrary terms); R.10-5, Emails, p.3, PageID 221 (sending Parker's terms); R.10-9, Emails, p.2, PageID 235 (same). It seems odd that Parker would reverse course and implicitly accept BorgWarner's terms after prolonged negotiation.

In *Gage Products v. Henkel Corporation*, 393 F.3d 629 (6th Cir. 2004), we addressed a similar question under Michigan law. We found that a seller likely made a business decision to relinquish its right to enforce a price increase when it "affirmatively assented, in writing and without qualification" to buy orders at a lower price. *Id.* at 639. But later, the seller made it clear

16

in writing that it would not accept the buyer's price terms. *Id.* at 642. For orders after these writings, we found that shipment of the goods no longer suggested the seller's acceptance of the new price. *Id.* There was a genuine issue of material fact as to what terms governed the contract based on the conduct between the buyer and seller (if such a contract existed at all). *Id.*

It would be similarly inappropriate for us to conclude that Parker agreed to the terms of the Revised Master Agreement by its conduct only. Here, nothing in Parker's email and terms communicated to BorgWarner suggest that it had assented to the terms of the Revised Master Agreement. R.10-5, Emails, p.2, PageID 221; R.10-2, Price Quotation, p.9, PageID 209; R.10-9, Emails, p.2, PageID 235. So like *Gage Products*, it is not clear that Parker's shipment of goods was an acceptance of BorgWarner's terms.

## IV.

Here is what we know: the terms attached to Parker's February Quote do not govern the contract and neither do the terms attached to BorgWarner's Initial Master Agreement. And it is at least arguable, if not likely, that Parker didn't agree to the terms of the Revised Master Agreement. But the parties had a contractual relationship. Ohio lets parties contract through conduct and recognizes that a contract may exist even if their writings would not create one. Ohio Rev. Code Ann. § 1302.10(C); *Avery*, 49 N.E.3d at 328. Because that is what the parties did here by shipping and accepting goods, under § 1302.10(C) a contract was formed, and its terms are the parties' writings plus any default terms.

But it is still not clear what elements of the parties' writings (if any) apply versus what default terms apply. For example, § 1302.22(C) requires "reasonable notification" to terminate a contract. Does that default term apply? And if so, did Parker give reasonable notification before canceling the contract? Or did Parker accept the terms of BorgWarner's Revised Master

17

Agreement when it filled the revised purchase order? These are matters of first impression for the district court to resolve.

For these reasons, we reverse the district court's grant of summary judgment for Parker and remand for further proceedings consistent with this opinion.[3]

---

[3] Because we find that Parker's terms do not govern the agreement, it necessarily follows that Parker cannot enforce its term providing for the recovery of attorneys' fees if BorgWarner did not comply with Parker's terms.

**DAVIS, Circuit Judge, dissenting.** The parties formed a contract under Parker's terms. Parker's February 2021 Quote was an offer. BorgWarner accepted that offer by issuing its purchase orders for Parts. And under Ohio's battle-of-the-forms provision, Parker's terms governed the parties' contract. Therefore, the district court properly granted summary judgment in Parker's favor. Because my colleagues conclude otherwise, I respectfully dissent.

I.

First, Parker's Quote was an offer. All agree that "a price quotation may suffice for an offer if it is sufficiently detailed and it 'reasonably appear[s] from the price quotation that assent to that quotation is all that is needed to ripen the offer into a contract.'" *Dyno Constr. Co. v. McWane, Inc.*, 198 F.3d 567, 572 (6th Cir. 1999) (alteration in original) (quoting *Quaker State Mushroom Co. v. Dominick's Finer Foods, Inc.*, 635 F. Supp. 1281, 1284 (N.D. Ill. 1986)). But the majority concludes that Parker's Quote, while "detailed and specific to BorgWarner," cannot be an offer because the terms reveal that more than BorgWarner's assent was necessary to create a binding contract. Maj. Op. at 13. This conclusion does not fully consider Ohio law or the parties' negotiations.

Under Ohio law, a price quote can constitute an offer when it is individually designed for a specific customer at the customer's request and is not generalized or boilerplate. *See, e.g.*, *Hydrodec of N. Am. LLC v. API Heat Transfer, Inc.*, No. 5:16-CV-2207, 2017 WL 3283997, at *6 (N.D. Ohio Aug. 2, 2017) (finding an offer where the "quotations were prepared for and sent exclusively to [the buyer]"); *SST Bearing Corp. v. MTD Consumers Grp.*, No C-040267, 2004 WL 2757601, at *2 (Ohio Ct. App. Dec. 3, 2004) (finding an offer where, in response to a potential customer's request for specific goods, the seller developed a quote containing a description of those goods and specifying the price, quantity, delivery terms, and time period within which the

19

stated prices would be held). Other states have similarly recognized this uncontroversial principle of contract law. *See, e.g.*, *Stelluti Kerr, L.L.C. v. Mapei Corp.*, 703 F. App'x 214, 225 (5th Cir. 2017) (holding that a price quote was an offer under Texas law where it was "prepared and revised twice specifically" for the customer at the customer's request); *Verasun Fort Dodge, L.L.C. v. Indus. Air Tech. Corp.*, No. C07-3013-MWB, 2008 WL 5069121, at *16 (N.D. Iowa Nov. 25, 2008) (determining that the price quote was an offer under Michigan law where there "was a specific quotation custom-designed for a specific customer at that customer's request and not a generalized or unsolicited quote sent to a number of potential customers"); *Nordyne, Inc. v. Int'l Controls & Measurements Corp.*, 262 F.3d 843, 846–47 (8th Cir. 2001) (concluding that a quote sent to specific customer, after months of discussions, containing specifics as to quantity, price, and time in which to accept the offer qualified as an offer under Missouri law).

Parker's Quote satisfies this principle when looking at both the writing and the objective context surrounding the writing's creation. The details of that context matter. BorgWarner initiated negotiations with Parker by first sending Parker a request for quote ("RFQ") for the Parts. In response to BorgWarner's RFQ, Parker prepared the February 2021 Quote exclusively for BorgWarner and included specified prices per unit, minimum shipping quantities, pricing based on anticipated volume, tooling costs, delivery terms, payment information, and the timeframe (sixty days) within which the Quote would remain available to BorgWarner. In other words, in response to BorgWarner's invitation to negotiate, Parker created a Quote tailored to BorgWarner's needs that left room for the contract to grow over the course of the business relationship. Parker's Quote included its own terms which stated, without equivocation, that BorgWarner's "order for any Products," no matter how BorgWarner communicated that order, "shall constitute acceptance of" Parker's terms. (Feb. Price Quotation, R. 10-2, PageID 209, ¶ 2). So, all that was necessary

20

to create a binding contract was BorgWarner's assent. *See Reedy v. Cincinnati Bengals, Inc.*, 758 N.E.2d 678, 683 (Ohio Ct. App. 2001) (finding season-ticket solicitation to be an offer where buyers expected to receive a personal seat license upon submitting an application in response to solicitation). Under these circumstances, the February 2021 Quote amounted to a valid offer.

The majority says this was not enough for Parker's Quote to qualify as an offer. Rather, because the Quote says that it "is tentative and subject to change pending entire review of purchase order and any specific requirements not presented in RFQ package at time of quotation," the Quote is marked by "telltale signs" it "was not an offer." Maj. Op. at 13. And providing pricing based on estimated annual use and minimum shipping quantities made the Quote too uncertain. *Id.* at 13.

I disagree. The words "tentative" and "subject to" should not be read in isolation. *Cf. In re Fifth Third Early Access Cash Advance Litig.*, 925 F.3d 265, 276 (6th Cir. 2019) (quoting *Sunoco, Inc. (R & M) v. Toledo Edison Co.*, 953 N.E.2d 285, 292, 295 (Ohio 2011) ("[W]e examine the contract 'as a whole' and attempt to 'give effect to every provision.'")). Here, the Quote's "tentative" notation simply served to notify BorgWarner that if its requirements for Parts needed adjustment outside of what Parker had built into the Quote for estimated annual use, Parker could—within the framework provided—rework the estimated costs, delivery terms, etc., as needed. (Feb. Price Quotation, R. 10-2, PageID 203). The Quote did not condition BorgWarner's assent on Parker's confirmation; it contained no language reserving to Parker final acceptance of a purchase order or requiring signatures before the Quote would become binding. So this language did not render the entire quotation tentative and thus not an offer.

Similarly, listing an estimated annual use and minimum shipping quantity did not make Parker's Quote fatally uncertain. Providing "volume projections" in lieu of "a specific quantity"

21

is "common in the automotive industry" as suppliers tend to rely on such volume projections to calculate price proposals. *Dicastal N. Am., Inc. v. Markowitz Metals Grp., LLC*, 633 F. Supp. 3d 999, 1016 (W.D. Mich. 2022). And here, Parker provided these figures to inform BorgWarner of *how* Parker calculated the prices in the Quote. In doing so, Parker used volume projections to fashion a Quote suited to BorgWarner's needs.

Citing *Babcock & Wilcox, Co. v. Hitachi America, Limited*, the majority reads Ohio law on the use of conditional language to require that we characterize Parker's Quote as an invitation to negotiate rather than an offer. *See* Maj. Op. at 12 (citing 406 F. Supp. 2d 819, 829 (N.D. Ohio 2005)). True, that court found a price proposal was not an offer where the correspondence accompanying the proposal called for further discussion. *Babcock & Wilcox*, 406 F. Supp. 2d at 829. But perhaps equally important in *Babcock & Wilcox* were the parties' actions: they continued to negotiate terms for six months after the proposal issued. *Id.* In determining that Hitachi's December 9, 1999, proposal was merely an invitation for negotiation, the court looked to their actions to tease out the "intention of the parties." *Id.* at 828. The proposal's language invited Babcock to respond with any questions or comments after reviewing it. *Id.* at 829. Acting on that language, the parties bargained for six months. *Id.* Indeed, Babcock's response two weeks after the proposal showed that it still considered the parties to be negotiating at that time. *Id.* The response asked Hitachi for its availability "to discuss and finalize" any "open issues" and confirm its intent to proceed with an agreement while the parties ironed out the details. *Id.* at 829–30. Prior to Babcock sending its first purchase orders, the parties "not only discussed the open issues but also renegotiated the price." *Id.* at 830. Negotiations did not end until Babcock sent its purchase orders. *Id.* From this, the court concluded the parties could not have intended for Hitachi's proposal to function as an offer. *Id.*

22

Here, by contrast, BorgWarner issued two purchase orders and releases for specific quantities of Parts within two months of Parker's issuance of the Quote. During the interim, the parties fleshed out logistical details like scheduling and shipping. And BorgWarner responded to Parker's Quote with a letter of intent to accept the offer, which incorporated prices in line with Parker's Quote.

BorgWarner argues that, even if the Quote were an offer, this letter of intent served to reject that offer. BorgWarner is mistaken. All this letter did was communicate BorgWarner's future intent to enter into a contract with Parker, which cannot "bind either party nor result in an enforceable contract." *Camden v. Kain*, Nos. 93APE11-1518/93APE11-1522, 1994 WL 232233, at *3 (Ohio Ct. App. May 26, 1994). If anything, the letter of intent provides additional details showing that the parties treated the Quote as an offer. The letter of intent served to "promote" Parker's "participation" in BorgWarner's development process. (Letter of Intent, R. 10-4, PageID 217). It was sent "prior to the issuance of a purchase order" and expressly disclaimed any intention to bind BorgWarner to a binding agreement—the purchase order would serve that purpose. (*Id.*). Parker acknowledged receipt of this letter of intent. In so doing, Parker crossed out terms in the letter that contradicted its own terms and conditions from the Quote. Parker signed and returned the letter on February 23, 2021, in an email which again included Parker's terms and conditions as an attachment. BorgWarner raised no concerns over Parker crossing out part of the letter of intent's terms. Instead, BorgWarner issued two purchase orders for the Parts the next day. So unlike in *Babcock & Wilcox*, the context here indicates that the Quote was an offer and the parties treated it like one.

II.

Next, BorgWarner accepted Parker's offer when it issued its purchase orders for Parts. To be sure, purchase orders are generally considered to be offers under Ohio law. *See Am. Bronze Corp. v. Streamway Prods.*, 456 N.E.2d 1295, 1300 (Ohio Ct. App. 1982). But under certain circumstances, like those present here, a purchase order can constitute an acceptance. *See Mead Corp. v. McNally-Pittsburg Mfg. Corp.*, 654 F.2d 1197, 1203–04 (6th Cir. 1981). That is because Ohio law allows a party to tender acceptance of an offer through a "definite and seasonable expression of acceptance or a written confirmation," even if it states contradictory terms. Ohio Rev. Code Ann. § 1302.10(A). Indeed, contradictory terms will void an acceptance only when "acceptance is expressly made conditional on assent to the additional or different terms." *Id.*

BorgWarner's purchase orders did not condition acceptance of Parker's Quote on Parker's assent to BorgWarner's terms and conditions. Each of BorgWarner's purchase orders states:

> Acceptance of this Purchase Order and any supply of goods under this Purchase Order is limited to the specific terms of this Purchase Order and any other different or additional terms proposed by Supplier are deemed material and are objected to and rejected by BorgWarner unless specifically agreed to in writing signed by an authorized representative of BorgWarner.

(Revised Master Agreements, R. 1-4, PageID 37). If BorgWarner's purchase orders were considered offers in this situation, then this language would successfully premise acceptance of the purchase orders on Parker's agreement to BorgWarner's terms and conditions. But, here, as explained below, BorgWarner's purchase orders amounted to an acceptance of Parker's offer. And nothing in this language states that BorgWarner conditioned its acceptance of Parker's offer on Parker's acceptance of BorgWarner's terms over its own.

BorgWarner's initial purchase orders provided Parker with a "definite and seasonable expression of acceptance," and, once BorgWarner sent them to Parker, a contract was formed.

24

Ohio Rev. Code Ann. § 1302.10(A); *see also Robert Bosch Corp. v. ASC Inc.*, 195 F. App'x. 503, 506 (6th Cir. 2003) (finding that a buyer's subsequent purchase order constituted an acceptance, since quotations specified price and quantity) (interpreting equivalent UCC provision under Michigan law); *Operating Tech. Elecs., Inc. v. Generac Power Sys., Inc.*, No. 4:12-CV-345-Y, 2014 WL 11498165, at \*5 (N.D. Tex. Mar. 11, 2014), *aff'd*, 589 F. App'x 292 (5th Cir. 2015) (same) (interpreting equivalent UCC provision under Texas law).  And that contract was governed by Parker's terms.  After all, Parker did premise acceptance of its offer and shipment of any goods on assent to its terms and conditions.

But what about the fact that BorgWarner's purchase orders proposed a different quantity term?  The majority agrees with BorgWarner's argument that Parker's February 2021 Quote was for a fixed quantity, while the purchase orders were requirements contracts.  So, there could not have been a meeting of the minds.

Yet, as discussed, Parker's offer was not for a fixed quantity.  It listed a projected annual use and a minimum shipping quantity.  This aligns with industry practice.  *Dicastal N. Am., Inc.*, 633 F. Supp. 3d at 1016.  In any event, BorgWarner could accept Parker's offer without every term being a perfect match.  *See* Ohio Rev. Code Ann. § 1302.10(A).  Any additional or different terms in the purchase orders would be considered "proposals for addition to the contract" unless the offer (i.e. the Quote) expressly limited acceptance to its terms.  *Id.* § 1302.10(B)(1).  Parker did just that; it conditioned its offer on "acceptance of [its] Terms" and objected "to any contrary or additional terms or conditions" requested by BorgWarner.  (Feb. Price Quotation, R. 10-2, PageID 209, ₱ 2).  So all of Parker's terms always would have governed under Ohio law.  If BorgWarner wanted Parker to know it did not agree, it should have been more explicit.  After all, the language necessary to condition acceptance on assent to additional or different terms must be "directly and distinctly

25

stated or expressed rather than implied or left to inference." *Dorton v. Collins & Aikman Corp.*, 453 F.2d 1161, 1168 (6th Cir. 1972) (quoting *Express*, Webster's Third International Dictionary (16th ed. 1971)). BorgWarner's purchase orders did not "clearly reveal[]" an *unwillingness to contract* unless Parker accepted its terms. *Id.* Instead, BorgWarner (1) attempted to inject new terms despite Parker's repeated and unmistakable requirement of acceptance of its terms as a precondition and (2) otherwise tendered acceptance as envisioned by the terms of the offer (sending the purchase orders). Under these circumstances BorgWarner's submission of the purchase orders worked as an acceptance of Parker's terms.

True, Ohio permits parties to contract by conduct where the writings of the parties do not establish a contract. Ohio Rev. Code Ann. § 1302.10(C). But Parker's and BorgWarner's writings do establish a contract, so we need not look to their conduct to discern what terms govern. Because Parker's terms continued to govern the relationship, Parker could implement price increases subject to the restraints specified within the contract. And I agree with the district court's analysis on this point: Parker implemented the price increases subject to those restraints, meaning BorgWarner was required to abide by the increases.

Finding a valid contract with discernable terms, I see no reason to remand for the district court to decide what terms govern based on the parties' conduct. And because BorgWarner breached those terms, I would affirm the district court's grant of summary judgment to Parker. Therefore, I respectfully dissent.